**EASTERN CONNECTICUT CITIZENS ACTION GROUP, et al.,
Plaintiffs-Appellants,**

v.

**Arthur B. POWERS, et al.,
Defendants-Appellees.**

**No. 400, Docket 83–7544.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1983.

Decided Dec. 7, 1983.

Martin Margulies, Hartford, Conn. (Connecticut Civil Liberties Union Foundation; Martha Stone, Laurence P. Nadel, of counsel), for plaintiffs-appellants.

Robert Y. Pelgrift, Wethersfield, Conn., Asst. Atty. Gen., for defendants-appellees.

Before KAUFMAN and VAN GRAAF-EILAND,* Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The right to communicate freely with one's fellow citizens and with the government on issues of public importance is a cornerstone of our American polity. The broad precepts of the First Amendment protect those who seek "peaceably to assemble, and to petition the Government for a redress of grievances." Expression of views on political issues must, however, be accomplished without unduly disrupting the orderly functioning of government. Accommodating the right of public speech and the state's need to discharge its responsibilities to its citizenry efficiently can indeed be a delicate task.

---

\* Because of the indisposition of the Honorable Clement F. Haynsworth, U.S. Court of Appeals, Fourth Circuit, sitting by designation, the parties agreed that this case be determined by Judges Kaufman and Van Graafeiland, who are in agreement. This procedure is authorized by § 0.14(b) of the Rules of this Court.

In this case, we are presented not with a direct prohibition on public expression, but with the subtler problem of government regulation which burdens an organization's ability to publicize its views in what it determines to be the most effective manner. The State of Connecticut has permitted appellant, the Eastern Connecticut Citizens Action Group (ECCAG), to use a particular piece of state property as a forum for political expression. That use, however, is conditioned on terms laid down by the state which ECCAG contends impose a prohibitive financial burden on its First Amendment rights. The district court held the regulations to be reasonable. We find that the state has failed to justify the burdens imposed on ECCAG's proposed activities, and remand for the fashioning of less restrictive administrative requirements.

## I

ECCAG, a non-profit organization headquartered in Willimantic, Connecticut, has as its goals the development of the economy and transportation systems of eastern Connecticut. The group's paramount concern in recent years has been halting the planned construction through the region of Interstate 84, and promoting, as an alternative, the revival of rail transportation. In pursuit of that aim, ECCAG developed a plan to conduct a "Railathon," or march, in 1980, along a thirteen-mile abandoned railway bed running between the towns of Willimantic and Manchester. ECCAG hoped the Railathon would express the group's opposition to the highway extension, and demonstrate the availability of a suitable corridor for a rail line. Because the rail bed passes under the interstate at one point, ECCAG felt that the selected route would graphically illustrate the choice between two competing modes of transportation.

The rail bed is owned by the state and managed by its Department of Transportation (DOT), which is required by statute to preserve it for future transportation purposes. Although the land is formally closed to the public, hikers, bicyclists, and others frequently use it for recreational purposes, and DOT makes no effort to deter trespassing. The rails and most of the ties have been removed, and the rail bed now resembles, according to appellants' uncontested testimony, a "country dirt road" which is "flat and walkable."

As planning for the Railathon proceeded, ECCAG's director, Geri Langlois, contacted DOT official Donald Leavitt to request permission to use the land. Leavitt initially informed Langlois that no such permission was needed, since hikers already walked on the property without interference from DOT. Subsequently, however, Langlois received a letter from Leavitt demanding a written request for use of the railway bed, and establishing four pre-conditions. ECCAG would have to agree to (1) pay an administrative fee of $100, (2) obtain adequate liability insurance coverage for the event, (3) execute a "save-harmless" clause protecting the state against legal actions relating to the march, and (4) covenant to clean up any debris, and to avoid trespassing on adjacent property. DOT later sent a "temporary right of entry" form to ECCAG, specifying the need to obtain a $750,000 insurance policy naming the state as co-insured.

ECCAG's 1980 budget totalled $12,000, all of which was allocated for rent, salaries and office expenses. Nevertheless, to avoid delay in the application process, the group paid the $100 fee and executed the temporary right of entry. Inquiries about insurance coverage were also made. Because ECCAG had no general liability coverage, the organization discovered it might not be able to obtain a "special events" policy of the type required. If it were, the quoted estimates for premiums ranged from $500 to $900. Because this expense was beyond its resources, ECCAG instituted a lawsuit against DOT to declare the requirements unlawful. Shortly afterwards, however, a separate but related organization calling itself the Connecticut Citizens Action Group was able to obtain a one-time rider on its insurance policy to cover the Railathon for an additional premium of $150. ECCAG

paid this cost from moneys allocated for other purposes.

The first Railathon was conducted on June 14, 1980. Numerous precautions were taken, successfully, to insure that no injury to persons or damage to property would occur. The route was plotted on topographical maps, and surveyed in advance so that dangerous spots could be bypassed. Appellants informed the police departments in all adjoining towns about the march. Each participant was given a brochure describing the event, and a map and set of rules before the march commenced. Each walker was required to sign a waiver of all claims arising from the Railathon. Directional signs were posted along the route, checkpoints were established at periodic intervals with refreshments and first-aid equipment, and five cars with identification approved by the State police patrolled the route. In all, the Railathon was staffed by twenty-two persons associated with ECCAG, better than one for every three participants.

The march took place entirely without incident. There were no injuries to marchers, and no reports of damage to State or adjoining private property. In fact, ECCAG considered the Railathon so successful that it decided to repeat the event in 1982. Upon inquiry, the group learned that DOT's administrative fee had risen to $200, and that the cost of insurance would be approximately $780. In the meantime, the group's annual budget had dropped to $9,500, and it carried a deficit of $4,600. Obtaining insurance coverage on ECCAG's policy was no longer possible. Appellees, however, were unwilling to waive any of their access requirements. Faced with apparently insuperable obstacles to the second Railathon, ECCAG proceeded with this litigation.

A one-day trial was held before Judge Cabranes in June 1982. The judge concluded that the State "had a special interest in maintaining the railway bed free of casual public use." DOT, he found, had "reason-

ably regulated" ECCAG's access to the property in furtherance of this interest, and had not infringed the group's First Amendment rights. He also held against appellants on their equal protection claim, finding that they "were not treated differently than other applicants for use of the railway bed." Holding that no injury to appellants' rights had been incurred, the judge entered judgment for appellees.

## II

ECCAG has abandoned its Equal Protection argument on appeal. It urges three claims relating to the infringement of its free speech rights. The group argues that the abandoned railway bed must be deemed a "public forum for purposes of expressive activity pertaining to rail transportation policy." Appellants also assert that the fee and insurance requirements represent facially unconstitutional prior restraints on public expression. Alternatively, they suggest that those requirements, even if facially valid, cannot lawfully be applied to parties who are demonstrably unable to comply and whose speech is therefore chilled by state action.

The genesis of public forum law lies in Justice Roberts' oft-quoted dicta in *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Public streets and parks, he wrote for the Court, "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 515, 59 S.Ct. at 963. While the use of these public spaces "for communication of views on national questions may be regulated in the interest of all ... it must not, in the guise of regulation, be abridged or denied." *Id.* at 516, 59 S.Ct. at 964. *Hague* thus rests the availability of a given locale as a public forum for speech upon its historical role as an arena for public expression.[1] *See Amal-*

1. Although we do not decide the issue, we note that the state's attempt to distinguish the abandoned railway bed from the traditional public forums like streets and parks is not wholly

successful. It is true that the state has officially declared the area off limits. The trial court did find, however, that the rail bed functions as

gamated *Food Employees Union Local 590 v. Logan Valley Plaza,* 391 U.S. 308, 315, 88 S.Ct. 1601, 1606, 20 L.Ed.2d 603 (1968); Stone, *Fora Americana: Speech in Public Places,* 1974 Sup.Ct.Rev. 233, 238–39, 251–52.

Since *Hague,* courts have broadened the public forum inquiry, recognizing that in many cases the use of a certain locale may be integral to the meaningful communication of a particular message. As we have noted,

> The propriety of a place for use as a public forum [turns] on the relevance of the premises to the protest . . . . In some situations the place represents the object of protest, the seat of authority against which the protest is directed. In other situations, the place is where the relevant audience may be found.

*Wolin v. Port of New York Authority,* 392 F.2d 83, 90 (2d Cir.1968) (citations omitted). Applying these principles, courts have opened to specific forms of expressive activity public property that serves a function akin to streets and parks as an arena for discussion. *See, e.g., Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (symbolic expression of anti-war views to fellow students in public high school); *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (protest against segregation in public library); *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (demonstration for antidiscrimination laws on state capitol grounds); *New York City Unemployed and Welfare Council v. Brezenoff,* 677 F.2d 232 (2d Cir.1982) (disseminating information to welfare recipients in welfare office); *Wolin v. Port of New York Authority, supra* (distribution of anti-war literature to servicemen arriving at bus terminal).

■ Like the private landowner, however, the state may exercise its control over property so as to protect the uses to which it is lawfully dedicated. *Perry Education Ass'n v. Perry Local Educators' Ass'n, ——*

U.S. ——, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983), *quoting United States Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129–30, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). The Supreme Court dealt with the issue in *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972), stating, "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." If it is, the state may impose reasonable time, place or manner restrictions or may, in cases of unavoidable incompatibility, bar speech altogether. *See The Supreme Court, 1975 Term,* 90 Harv.L.Rev. 56, 152–59 (1976).

*Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), provides an illustration of this reasoning. The Court upheld the decision of the commanding officer of Fort Dix to deny access to the base for political campaigning. Because it is the "business of a military installation like Fort Dix to train soldiers," use of the base by the candidates could validly be prohibited in the interest of "keeping official military activities there wholly free of entanglement with partisan political campaigns of any kind." *Id.* at 838–39, 96 S.Ct. at 1217–18. Accordingly, the government was not obliged to permit on its property expressive activity which would conflict with the primary purpose for which that property was intended. *Accord, United States Postal Service v. Council of Greenburgh Civic Ass'ns, supra,* 453 U.S. at 130 n. 6, 101 S.Ct. at 2685 n. 6 (use of letterboxes as public forum for distribution of unmailed notices for community association "wholly incompatible" with safe and efficient nationwide postal system).

The instant case, however, is not one in which the state has barred public speech on its property. On the contrary, DOT has conditionally agreed to allow the Railathon to take place. Indeed, in its initial response to ECCAG's inquiries, DOT told the group that the march could be conducted without

---

a park for recreational purposes of all sorts, and is widely used by the public.

eliciting permission. We commend the agency for willingly recognizing that EC-CAG should have the opportunity to communicate its message in the chosen forum. The state now, however, argues that DOT retains the discretion to adopt any conditions it wishes before ECCAG may exercise its First Amendment rights. We cannot accept the suggestion that the state may unreasonably or without restraint regulate appellants' speech in any manner it sees fit, regardless of how excessive or chilling that regulation may be.

The state has conceded, and the district judge explicitly found, that the rail bed was a particularly appropriate site for the message appellants intended to convey. Although the state may indeed protect its "special interest" in preserving the corridor for future transportation purposes (an interest, we note, which appellants fully endorse), we are unable to discern any interference with that purpose resulting from the proposed Railathon. The state may not infringe First Amendment rights on generalized and unsupported assertions that speech would clash with other governmental interests; real and substantial conflict must be demonstrated before constitutional rights may be abridged. *Cf. Tinker v. Des Moines Independent Community School District, supra,* 393 U.S. at 513–14, 89 S.Ct. at 740–41 (expressive activity must "materially and substantially disrupt" other interests if it is to be regulated); Note, *The Public Forum: Minimum Access, Equal Access, and the First Amendment,* 28 Stan.L.Rev. 117, 138 (1975). Because we perceive no disruption by the Railathon of the primary purposes to which the state property is committed, we hold that appellants may use that property as a forum for communicating their intended message.

The state, however, would have us rule that when government property is formally closed to the public generally, no right of access exists in favor of any individual or organization, regardless of the purposes for which entry is sought. At most, the state contends, ECCAG had a revocable privilege to use the rail bed as a forum for expressing its views. We cannot accept this argument. As we have made clear, free speech must be balanced against competing governmental interests in determining when a public forum must be made available. The state, explicitly or implicitly, must strike that balance every time it is confronted with a would-be speaker seeking a public forum. Its exercise of discretion in that regard cannot infringe constitutional rights and must be guided by legal principles. If the state could automatically bar speech on its property by the simple expedient of closing it to all potential users, the protection of vital First Amendment rights would be placed beyond the purview of the courts. We cannot accept a principle that would vest such discretionary power in a state administrative agency, *see Cox v. Louisiana,* 379 U.S. 536, 555–58, 85 S.Ct. 453, 464–66, 13 L.Ed.2d 471 (1965), or that would infringe so deeply upon our own duty to "say what the law is," *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803). When the state acts in a manner which threatens to impair free expression by its citizenry, it is required, when requested, to place its reasons before a court for a determination of their conformity to constitutional norms.

### III

We now turn to an evaluation of the validity of the conditions established by DOT for the Railathon. In holding that ECCAG had a protected right to use the railway bed for communicative activities, we do not suggest that the state was powerless to regulate that use in any manner. The state may regulate the time, place and manner of expression, *Perry Education Ass'n v. Perry Local Educators' Ass'n, supra,* 103 S.Ct. at 955, but such regulations must be "closely related to a significant governmental interest, and must be the least restrictive means of serving that interest." *New York City Unemployed and Welfare Council v. Brezenoff, supra,* 677 F.2d at 237. Prior restraints on speech, even in the form of restrictions rather than prohibition, are heavily disfavored and must

be construed as narrowly as possible. *See Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951); *Hull v. Petrillo,* 439 F.2d 1184, 1186 (2d Cir.1971).

Not long after its decision in *Hague, supra,* the Supreme Court sanctioned the imposition of permit or license requirements as prerequisites to speech in public forums. In *Cox v. New Hampshire,* 312 U.S. 569, 575–76, 61 S.Ct. 762, 765–66, 85 L.Ed. 1049 (1941), the Court noted that local authorities had a valid interest in advance notification of marches, parades, and the like, to assure proper police protection and minimal inconvenience to the general public. In this case, DOT puts forward two reasons for requiring a $200 administrative fee for use of the railway bed: to compensate the agency for the expense of processing the application, and to deter frivolous requests for the use of state property.

■ Licensing fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose. *Fernandes v. Limmer,* 663 F.2d 619, 633 (5th Cir.1981), *reh'g en banc denied,* 669 F.2d 729, *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982). In *United States Labor Party v. Codd,* 527 F.2d 118 (2d Cir.1975), we upheld a permit fee for the use of sound amplification devices, on a specific finding that "the administrative costs associated with the enforcement of the licensing ordinance far exceeded the five dollars charged for a permit." *Id.* at 120. Here, the court below found "no evidence that the administrative fee charged and to be charged to plaintiffs is equal to the cost incurred or to be incurred by defendants for processing plaintiffs' request to use the property under DOT's control." Absent such a showing, DOT's administrative fee cannot be sustained.

■ DOT's second justification for the administrative fee was soundly rejected by the Supreme Court in *Bullock v. Carter,* 405 U.S. 134, 145–46, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972), which held that the exercise of constitutional rights may not be conditioned upon financial requirements for the purpose of deterring frivolous requests. Here, as there, a fee is no more likely to deter frivolous than legitimate applicants. This is particularly evident when the fee is applied to persons who have "affirmatively alleged that they were *unable,* not *unwilling,* to pay." *Id.* at 146, 92 S.Ct. at 857. We thus find that the administrative fee cannot be applied here except to the extent that DOT can demonstrate, on remand, its necessity as a means of offsetting expenses associated with processing applications for access to property under its control.

■ The district court found that DOT's "sole reason for requiring insurance was to avoid the loss to the State of Connecticut from any and all claims made as a result of plaintiffs' activities on the railway line between Manchester and Willimantic." While the state has a legitimate interest in protecting itself from liability for injuries associated with the use of its property, we are not persuaded that the insurance requirement represents the least restrictive means of serving that interest.[2]

It was undisputed at trial that the earlier Railathon produced no injuries or claims against the state, and indeed that no claims had ever been made resulting from any use of the railway bed. Even if DOT had been able to demonstrate that the risk of injury and consequent liability was a significant one, the agency made no attempt to show that the precautions taken by ECCAG were inadequate protection. Indeed, the organization appears to have been most diligent and cooperative in its attempts to meet the state's demands and to insure the safety of the walkers. We have described the group's numerous efforts to minimize risk

---

**2.** An insurance requirement may raise other constitutional issues. As the trial court found:

In denying an application for an insurance policy, brokers or underwriters often consider political beliefs of those who have applied for insurance coverage, the likelihood of adverse publicity to the insurance company, the lack of business experience of the group, and other invidious or irrelevant factors. Consideration of such factors play a part in the decisions of an underwriter to reject insurance coverage applications.

to Railathon participants and damage to adjoining property. In addition, ECCAG and every marcher signed waivers of any and all claims against the state arising from the Railathon. To the extent that the state's concern relates to the threat of damage claims from neighboring landowners, that danger may be addressed through existing civil and criminal sanctions for trespassing, vandalism, and so on. Absent a showing that those carefully-crafted remedies are unavailing in this instance, the state may not insist upon broader restrictions which substantially infringe constitutional rights, particularly in light of the uneventful history of the previous Railathon. Cf. *Schneider v. State,* 308 U.S. 147, 162–63, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939) (city may not bar leafletting on public street to prevent littering, where narrower methods are available).

Even were the liability insurance requirement valid, no basis has been offered for the amount of coverage required. We would note the consideration of this issue by courts in two cases involving highly controversial and particularly disruptive demonstrations by the National Socialist [Nazi] Party of America in Chicago and Skokie, Illinois. In *Collin v. O'Malley,* No. 76 C 2024 (N.D.Ill. July 29, 1977), *motion for stay denied,* 452 F.Supp. 577 (N.D.Ill.1978), a requirement that plaintiffs obtain a $100,-000/$300,000 liability policy and a $50,000 property damage policy was struck down as an unreasonable restraint on First Amendment rights. An equivalent requirement was deemed facially invalid by the district court in *Collin v. Smith,* 447 F.Supp. 676, 684–86 (N.D.Ill.1978), and improperly applied by the circuit court, after defendants conceded that point, 578 F.2d 1197, 1207–09 (7th Cir.), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). The risk of liability and property damage was surely far greater in those cases than that which confronted the State of Connecticut from the activities proposed by appellants here.

We therefore conclude that ECCAG's First Amendment rights were violated by DOT's conditions of access to the abandoned rail bed for the expression of the organiza-tion's views on state transportation policy. We do not hold that the state was obligated to open the railway bed to all groups or individuals seeking to use it. Nor do we suggest that DOT's fee and insurance requirements would not be valid when reasonably applied. But when the proposed use of state property involves the exercise of constitutional rights, fee and insurance conditions must be carefully scrutinized. Here, ECCAG seeks access for the purpose of communicating a message of public import which is intimately related to the forum sought. In these circumstances, the state may not impose conditions more restrictive than necessary to protect its competing interests in the property. Accordingly, we reverse the judgment, and remand to the district court for further proceedings consistent with this opinion.