KNOLLS ACTION PROJECT, M. Louise McNeilly, Sister Danielle Bonnetti, Maureen Casey, David Miller, Dr. Jean M. Haynes, Father Bill Ryan, Father Paul Smith, Frank Zollo, Father Jay Murnane, Sister Mary Theresa Streck, Plaintiffs,

v.

KNOLLS ATOMIC POWER LABORATORY, ("KAPL"), Donald P. Hodel, United States Secretary of Energy, T.J.E. Glasson, Public Information Director, "KAPL", Albert E. Kakretz, General Manager, "KAPL", Mr. Cox, Vice President of General Electric, Defendants.

No. 83–CV–267.

United States District Court, N.D. New York.

Jan. 4, 1985.

New York Civil Liberties Union, New York City, for plaintiffs; Steven R. Shapiro, New York City, of counsel.

McNamee, Lochner, Titus & Williams, P.C., Albany, N.Y., for defendants Glasson,

Kakretz and Cox; Victor A. Lord, Albany, N.Y., of counsel.

Frederick J. Scullin, Jr., U.S. Atty., Albany, N.Y., for defendant Hodel; David R. Homer, Asst. U.S. Atty., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This action arises out of alleged constitutional violations stemming from defendants' decision to bar plaintiffs, and all other groups, from distributing leaflets at the Knolls Atomic Power Laboratory ("KAPL") in Niscayuna, New York. Plaintiffs seek injunctive and declaratory relief and predicate jurisdiction upon 28 U.S.C. §§ 1341, 1343. A trial to the Court was held on July 11–12, 1984.[1] The final submissions of counsel were filed on October 15, 1984. There follow the findings of fact and conclusions of law mandated by Fed.R. Civ.P. 52(a).

### II

Plaintiff Knolls Action Project ("KAP") is an organization of concerned residents in the Albany, New York area whose purpose is to inform the public of the dangers of nuclear war.[2] Presently, there are approximately thirty active members of KAP with several hundred other individuals receiving KAP mailings on a regular basis. KAP disseminates its message by sending newsletters and other pertinent information to the individuals on its mailing list, assisting in the organization and preparation of peaceful demonstrations against the deployment and use of nuclear weapons, and leafletting on a regular basis at nuclear research sites in upstate New York. *See* Trial Transcript at 6–8. In its leafletting activity, KAP believes that the ability to have personal contact with those individuals it is seeking to reach is critical in relaying the full message of KAP. As one member of KAP explained, "[w]e are more interested in being able to talk to people, and say good morning, have a nice day, than we are interested in having the sign that says good morning and have a nice day." Trial Transcript at 37.

Defendant KAPL is a federally-owned, classified nuclear research facility, located in Niscayuna, New York, and operated by the General Electric Company ("GE") pursuant to a government contract.[3] KAPL occupies a large, rural tract of land bordering the Mohawk River to the north, River Road, a public highway, to the south, the city of Schenectady to the west, and the Town of Colonie to the east. A substantial portion of the property, containing the laboratories and other buildings, is access-restricted and encircled by a fence. In order to enter this restricted area, an individual must pass through a guarded checkpoint where identification is verified.

To the south of the secured area, though still within KAPL property, is a parking lot for employee use. A paved walkway connects the parking lot to the checkpoint at

---

1. The following witnesses testified at the behest of the plaintiffs: plaintiff Maureen Casey; John Ragusa, a former active member of Knoll Action Project; Karen Rembert, a former employee of KAPL; and plaintiff Louise McNeilly. The following witnesses testified at the behest of defendants: Lance Stewart, KAPL's security manager; defendant Theodore Glasson; Daniel Kelly, KAPL's chief of security; Robert Traxler, KAPL's manager of laboratory support services; and defendant Alfred Kakretz.

2. In addition to KAP, several members of KAP and other similar groups are listed as plaintiffs in this action. Complaint, ¶¶ 4–13.

3. The entire KAPL complex actually includes two other sites in West Milton, New York, and Windsor, New York. Neither of these sites, however, is relevant to the present action. In addition to KAPL, several employees of KAPL, the United States Secretary of Energy and the vice president of GE in charge of KAPL are named as defendants. Complaint, ¶¶ 15–18. Defendants do not contest that the government's involvement in KAPL constitutes government action for the purposes of first amendment analysis. Trial Transcript at 85.

the secured area.[4] A grass field separates the parking lot from KAPL's southern boundary along River Road.[5] Two roads, one from an east entrance and one from a west entrance, traverse the field, thus connecting River Road to the parking lot and providing access to KAPL from a public highway.[6] KAPL's property line is clearly marked on the west access road by a painted white line located approximately twenty feet north of River Road. In addition, signs are posted at the beginning of each access road indicating that the property is restricted and that no trespassing is permitted. Defendants' Exhibit E. Signs also are posted at approximately one hundred foot intervals along the border of the property, indicating that no trespassing is permitted. Defendants' Exhibit D; Trial Transcript at 91, 132, 157.

In 1978, KAP commenced handing out leaflets, reflecting opposition to the work being performed at KAPL, to KAPL employees as they arrived for work in the morning. At first, KAP members positioned themselves on the south side of River Road, across the road from KAPL's property. At some time prior to 1981, the leafletters moved across River Road and began to stand on the KAPL property line at the entrance to the west access road.[7] Generally, every Friday morning between 7:00 AM and 8:00 AM, one or two KAP members would stand on the yellow dividing line in the middle of the access road and offer the leaflets to drivers as they turned onto the access road from River

Road. In January of 1981, due to concerns over the possibility of automobile accidents involving drivers stopping at the entrance to the access road to speak with KAP members and to receive leaflets, Lance Stewart, KAPL's security manager, informed the KAP members that they could station a person across the KAPL property line, further onto the access road.[8] Apparently, although not the fault of the leafletters, just prior to Stewart's decision, an accident in fact had occurred at the entrance to the access road. Trial Transcript at 117.

In July of 1982, after a meeting between Stewart, Jamie Gearon, KAPL's general counsel, Robert Traxler, KAPL's manager of laboratory support services, Theodore Glasson, KAPL's manager of Health and Environment Protection, and Albert Kakretz, KAPL's general manager, the permission for KAP to leaflet on KAPL property was revoked and KAP was informed that neither it nor any other group not affiliated with business at KAPL could enter onto KAPL property. KAPL cited several reasons for its decision. First, KAPL stated that a ban on all access to its property, other than for business purposes, was consistent with GE's policy of restricting public access to its plants and was necessary considering the classified nature of the work performed at KAPL. Trial Transcript at 114, 189, 202. Second, KAPL indicated that it was concerned with the potential liability that it could incur if an accident occurred on its property involving a KAP member. *Id.* at 104, 111, 139, 147,

---

4. The walkway also is separated from the restricted area by a grass field approximately 20 feet in length. Trial Transcript at 124.

5. The town of Niscayuna has an easement in a bike path which traverses the grass field. Trial Transcript at 91. This easement, however, is limited to biking and hiking. *Id.*

6. While two access roads traverse the property, this action has only concerned the west access road due to the significant number of automobiles that use the west access road every morning. *See* Trial Transcript at 117.

7. It is unclear as to the precise point in time when KAP members began to stand on KAPL

property. Some testimony indicates that, prior to 1981, plaintiffs would "[o]ccasionally ... be on the [property] line, and occasionally [be] over the line on [KAPL] property, and occasionally [be] over the line on Niscayuna property...." Trial Transcript at 55. It is clear, however, that KAP members were actually leafletting on KAPL property by January of 1981. *Id.* at 102, 108.

8. It should be noted that Stewart did not check with his superiors prior to permitting KAP this limited entrance onto the property. Trial Transcript at 108. However, since KAP members remained on the property for 18 months, it cannot be said that the management of KAPL was not aware of their presence.

190.[9] KAPL's awareness of this risk was heightened in June of 1982 when Kakretz received a letter from an employee informing Kakretz of the risks involved and the potential for legal action. *Id.* at 221. Finally, KAPL feared that continued leafletting on KAPL property could potentially interfere with GE's policy prohibiting unions from meeting or picketing on plant property. *Id.* at 114, 143, 194, 197. This concern assertedly was prompted by labor difficulties and picketing at KAPL during the spring of 1982. *Id.* at 225.

KAP, however, contends that the decision to bar its members from leafletting on KAPL property infringes upon its first amendment right of free expression. Initially, KAP argues that the true reason for the ban was not fear of liability or union reprisals. KAP points out that between January of 1981 and July of 1982 its members distributed leaflets on the access road weekly without incident. In addition, security reports, which were prepared by KAPL security officers on a weekly basis, never mentioned any incident caused by, or involving, KAP members. Plaintiffs' Post-Trial Memorandum of Law at 10. In fact, at least one security report stated that KAP leafletters "were very courteous and friendly and appeared to cause no threat to the site." Trial Transcript at 174. According to KAP, the true reason for the ban was the increased publicity generated by KAP activities at KAPL and elsewhere. For example, in May of 1982, a group of protestors, including members of KAP, marched past KAPL as part of a nationwide "peace walk" to a disarmament rally in New York City. In addition, on May 30, 1982, a "pentecost prayer vigil" was held along the south side of River Road in which KAP members, and other protestors, sang songs and said prayers for the elimination of nuclear weapons. Both events received extensive media coverage. These activities had a direct impact on KAPL when, in June of 1982, a secretary at KAPL publicly re-

signed from her position due to the message relayed by KAP in its leaflets and at its demonstrations. These incidents, along with the increased general press coverage of the nuclear issue, according to KAP, led KAPL to implement its ban on leafletting.

Since the inception of this ban, KAP has offered, as a compromise, to leaflet on the paved walkway connecting the parking lot to the secured area. To date, KAPL has refused this offer, claiming that leafletting on the walkway also would be inconsistent with the purpose of KAPL. Thus, KAP currently is being forced to limit its leafletting activities at KAPL to the south side of River Road, across from the access road entrance. According to KAP, this alternative poses a substantially greater risk of injury to the leafletters, due to the narrowness of the roadside, and also has decreased the number of leaflets distributed by its members from 250 a week to less than 100 a week. Plaintiffs thus commenced this action seeking injunctive and declaratory relief on the basis of alleged first amendment violations.

### III

It is well established that peaceful leafletting and picketing constitute "expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983). The first amendment, however, "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). The mere fact that property is government owned and controlled does not guarantee an individual access to it under all circumstances. *United States Postal Service v. Greenburgh Civic Associations,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981).

---

**9.** Apparently, this concern was magnified by several reports of "near misses" through the spring of 1982. Trial Transcript at 111, 162. One accident actually had occurred at the west access road in late 1980. However, KAPL admits that the leafletters were not involved. *Id.* at 101–02.

"There is little doubt that in some circumstances the Government may ban the entry on to [sic] public property that is not a 'public forum' of all persons except those who have legitimate business on the premises." *United States v. Grace,* 103 S.Ct. at 1707. The ability of a leafletter to occupy a specific public tract of land, and the ability of the government to ban or restrict the use of that land, therefore depends on the character of the property in question. *Members of the City Council v. Taxpayers for Vincent,* ── U.S. ──, 104 S.Ct. 2118, 2134, 80 L.Ed.2d 772 (1984); *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

▉▉▉ The Supreme Court, in *Perry,* set forth the three categories of public property for first amendment analysis. The first category, and the one most carefully scrutinized for first amendment protection, encompasses those areas "which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. at 45, 103 S.Ct. at 954–955 (quoting *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)). In such traditional public forums, the government may not prohibit all speech, *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. at 45, 103 S.Ct. at 954, and must ensure that any time, place and manner restrictions on use are content-neutral, narrowly tailored to serve the government interest involved and provide for alternative means of expression. *Id.* A second category of public property encompasses "property which the state has opened for use by the public as a place for expressive activity." *Id.* In such a designated public forum, the state is bound by the same constitutional protections as it is in a traditional public forum. *Id.* at 46, 103 S.Ct. at 955.[10] The third category of public property encompasses areas which are "not by tradition or designation a forum for public communication." *Id.* In such a nonforum, *Perry* provides that "[i]n addition to time, place and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

Plaintiffs do not contend that KAPL is a traditional public forum under the *Perry* analysis. Rather, the gravamen of plaintiffs' complaint is that the Government, by permitting KAP to distribute leaflets on KAPL property from January of 1981 until July of 1982, "opened its property to the use of the people for communicative purposes," *United States v. Grace,* 103 S.Ct. at 1707, and thus transformed KAPL, or at least the access road, into a designated public forum. As such, plaintiffs argue that an absolute ban on all speech at KAPL is inappropriate for such a forum and does not meet the constitutional requirements for a viable time, place and manner restriction.

Initially, plaintiffs contend that the ban, as applied to KAP, is content-based. While the new KAPL policy prohibits *all* groups not having business at KAPL from entering onto its property, plaintiffs point to the alleged total lack of support for defendants' safety and liability concerns: in over a year of leafletting on KAPL property KAP members had never been involved in any sort of accident or incident, KAPL security reports had indicated that the leafletters were not disruptive, and KAPL's security manager had recommended that the leafletters be permitted to remain at

**10.** The difference between a traditional public forum and a designated public forum, according to *Perry,* is that in the latter, "a State is not required to indefinitely retain the open character of the facility." *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. at 46, 103 S.Ct. at 955. It is unclear, however, as to how a state may go about eliminating the open character of the forum.

the access road. In light of this evidence and "[g]iven the clear evidence that plaintiffs' leafletting was attracting increasing attention," Plaintiffs' Post-Trial Memorandum of Law at 23, plaintiffs classify defendants' reliance on the safety and liability issues as "a convenient excuse and classic legal pretext." *Id.*

In addition, plaintiffs contend that a total ban on speech for all groups at KAPL is inconsistent with the constitutional requirement of content-neutrality. Arguably, the Supreme Court has impliedly limited the implementation of absolute prohibitions on speech in recent opinions in which narrower restrictions have been upheld. *See, e.g., Members of the City Council v. Taxpayers for Vincent,* —— U.S. ——, 104 S.Ct. 2118, 2133, 80 L.Ed.2d 772 (1984) (ordinance prohibiting the posting of signs on public utility poles "does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited"); *Clark v. Community for Creative Non-Violence,* —— U.S. ——, 104 S.Ct. 3065, 3070, 82 L.Ed.2d 221 (1984) (prohibition against overnight sleeping in park "otherwise left the demonstration intact, with its symbolic city, signs, and the presence of those who were willing to take their turns in a day-and-night vigil"). As Judge Kaufman indicated in *Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050 (2d Cir.1983):

> If the state could automatically bar speech on its property by the simple expedient of closing it to all potential users, the protection of vital First Amendment rights would be placed beyond the purview of the courts. We cannot accept a principle that would vest such discretionary power in a state administrative agen-

cy, or that would infringe so deeply upon our own duty to "say what the law is." When the state acts in a manner which threatens to impair free expression by its citizenry, it is required, when requested, to place its reasons before a court for a determination of their conformity to constitutional norms.

*Id.* at 1055 (citations omitted).

Finally, plaintiffs allege that the restriction is not narrowly tailored to serve the Government's interest and does not leave open reasonable alternative means of expression considering defendants' unwillingness to discuss alternative sites at KAPL for leafletting, i.e., the walkway between the parking lot and checkpoint.

Even assuming that KAPL is not a designated public forum and thus falls within the third nonforum category under *Perry,* plaintiffs contend that the absolute prohibition is nonetheless invalid. Two reasons are set forth in support of this position. First, regardless of the type of forum involved, *Perry* suggests that content-based prohibitions on speech, without justification, are never permissible. *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. at 45–49, 103 S.Ct. at 954–957.[11] Second, and more important, the *Perry* standard for nonforums of "reserv[ing] the forum for its intended purposes ... as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view," *id.* at 46, 103 S.Ct. at 955, has been interpreted in the Second Circuit to be premised upon the incompatibility of the specific speech with the property in question. *Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1054 (2d Cir.1983). Accord-

---

**11.** While this statement is accurate as a general rule, *Perry* indicates that, at certain times, content-based restrictions may be permissible in a nonforum:

> Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limit-

ing a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.

*Perry Education Association v. Perry Local Educators' Association,* 460 U.S. at 49, 103 S.Ct. at 957.

ing to Judge Kaufman, if the manner of expression is "basically incompatible" with the nature of the nonforum, the State may impose time, place and manner restrictions on its use. *Id.* If the manner of expression is "unavoidably incompatible" with the nature of the nonforum, the State may absolutely ban speech on the property. *Id.; accord New York City Unemployed and Welfare Council v. Brezenoff,* 742 F.2d 718, 720–21 (2d Cir.1984); *see Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767, 772 (2d Cir.1984). Given that KAP had distributed leaflets peacefully and without incident for over a year on KAPL property, plaintiffs contend that such speech thus cannot be considered unavoidably incompatible with KAPL property.

 After careful review of plaintiffs' claims and the relevant case law, the Court finds that no constitutional deprivation has occurred. Initially, the Court notes that KAPL, by permitting two KAP members to distribute leaflets on KAPL property every Friday morning for over a year, did not open its property to the public "for communicative purposes," *United States v. Grace,* 103 S.Ct. 1707, and thus did not create a designated public forum. It is well settled that "[m]erely permitting public access to property other than streets or parks … does not open the [property] for use as a public forum." *United States v. Albertini,* 710 F.2d 1410, 1414 (9th Cir.1983), *cert. granted,* —— U.S. ——, 105 S.Ct. 562, 83 L.Ed.2d 504 (1984). Two Supreme Court cases clarify this point. In *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), the Court held that a ban on political speech on a military base was constitutional since the historical and traditional usage of the property did not lend itself to free expression. *Id.* at 838, 96 S.Ct. at 1217. In so holding, the Court expressly rejected "the principle that whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment." *Id.* at 836, 96 S.Ct. at 1216; *accord Persons for Free Speech at SAC v.*

*United States Air Force,* 675 F.2d 1010, 1015 (8th Cir.), *cert. denied,* 459 U.S. 1092, 103 S.Ct. 579, 74 L.Ed.2d 939 (1982); *but see United States v. Albertini,* 710 F.2d at 1415 (government abandoned control of portion of military base when it continually permitted the public at large access to open house events). More important, in *Perry,* the Court upheld a board of education decision, pursuant to a collective bargaining agreement, to restrict union access to the interschool mail system and teacher mailboxes to only the official representative of the teachers. *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. at 55, 103 S.Ct. at 960. In holding that the prohibition had to be analyzed under the third nonforum category, the Court stated:

> The use of the internal school mail by groups not affiliated with the schools is no doubt a relevant consideration. If by policy or by practice the Perry School District has opened its mail system for indiscriminate use by the general public, then PLEA could justifiably argue a public forum has been created. This, however, is not the case. As the case comes before us, there is no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public. Permission to use the system to communicate with teachers must be secured from the individual building principal. There is no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material. We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. This type of selective access does not transform government property into a public forum.

*Id.* at 47, 103 S.Ct. at 956.

Given this analysis, it is clear that no public forum exists, by tradition or designation, here. When Stewart permitted the two KAP members to leaflet on the access

road, he did not, expressly or impliedly, give the public, or KAP, carte blanche in their ability to express their views on KAPL property. He specifically informed the leafletters where they could stand and how many of them could in fact come onto KAPL property. As with all other activities at KAPL, the location of the leafletters and their behavior were continually monitored through security reports prepared by Stewart and his subordinates. The nature of the property as a classified facility, and the warnings against unauthorized entrance by the general public through the placement of the no trespassing signs at the entrance to the access road and surrounding the property, remained the same as prior to the leafletters' entry. The fact that KAPL permitted this limited access to continue for over a year in no way altered the restricted nature of the access or the restricted character of the property itself. Considering, therefore, the nature of the access granted to KAP and the Supreme Court's analysis in *Perry*, it cannot be said that KAP's "selective access" to KAPL constituted "indiscriminate use by the general public," *id.*, creating a public forum by designation. The constitutionality of the prohibition, therefore, must be examined within the third nonforum category as set forth in *Perry*.

 In examining the KAPL ban under this content-neutral reasonableness standard, the Court holds that such a prohibition on expression at the facility is constitutional, and in fact, warranted by the character of the facility itself. There is nothing divergent of legal precedent in prohibiting all speech on nonpublic forum property and preserving such property for its intended business purpose. *E.g., Members of the City Council v. Taxpayers for Vincent*, —— U.S. ——, 104 S.Ct. 2118, 2134, 80 L.Ed.2d 772 (1984) [12]; *Greer v. Spock*, 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976); *Lehman v.*

*City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion). As plaintiffs have indicated, expression may be totally banned on nonforum property when it is unavoidably incompatible with the character of the property itself. *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1054 (2d Cir.1983). Accordingly, this Court holds that the presence of leafletters, regardless of their specific group affiliation, on KAPL property is unavoidably incompatible with the character of the property.

 This Court rejects plaintiffs' contention that the mere fact that KAPL permitted KAP to leaflet for eighteen months on the access road establishes that such expression is not unavoidably incompatible with the property. Unavoidable incompatibility does not solely mean "physical" incompatibility. Rather, it means that the expression sought cannot conform to the traditional purpose of the property. Judge Kaufman's decision in *Eastern Connecticut* confirms this analysis by citing *Greer* as an example of total incompatibility. As defendants point out, KAP is arguing that "whenever an error in judgment results in the exercise of expressive rights at a classified Government installation, that facility cannot now, and cannot ever for all time thereafter, terminate the privilege." Defendants' Post-Trial Memorandum at 2–3. The Court rejects this reasoning. KAPL is a restricted, classified government/private sector venture performing highly sensitive work for the Navy in the field of nuclear research. Other than in a few limited instances, it has a history of barring all individuals from access if their presence is not business related. As with the military installation in *Greer*, the Government has an obvious interest in restricting public access to the facility in order for the intended business of the facil-

---

**12.** While plaintiffs attempt to distinguish *Vincent* on the ground that there were adequate alternative forums for expression available "in the same place where the posting of signs on public property is prohibited," *Members of the* *City Council v. Taxpayers for Vincent*, 104 S.Ct. at 2133, such a distinction does not negate the fact that *Vincent* upheld an absolute ban on expression in the nonforum therein discussed, namely, public utility poles.

ity to proceed without actual or potential interruption. If ever a government facility may be deemed appropriate for a total ban of free expression on the premises, it would appear that a classified facility, such as KAPL, must be at the forefront of the list.

Of equal importance to this analysis are defendants' safety, liability and labor relation concerns over continuing to permit KAP leafletters access to KAPL property. Considering the recent labor difficulties at KAPL, and GE's historical concern over limiting the potential liability for accidents on the premises,[13] the Court finds these concerns to be reasonable, in light of the close proximity of the access roads to a public highway (River Road) and the potential ramifications of labor difficulties over the ability to picket on KAPL property. The fact that no accident has ever occurred in the time that KAP has distributed leaflets on the access roads does not suggest that no risk is present and that the elimination of such a risk is not a reasonable basis for restricting speech. In *New York City Unemployed and Welfare Council v. Brezenoff*, 742 F.2d 718 (2d Cir.1984), the Second Circuit stated that "hypothetical" risks may be a basis for restricting expression on nonforum property. *Id.* at 722–23. In upholding a prohibition against the solicitation of welfare organization memberships at New York City welfare offices as a means of limiting the risk of fraud, the Court noted:

> The Council argues that the HRA's restrictions are constitutionally impermissible because HRA's interest in preventing fraud is "hypothetical," in that there have been no reported cases of solicitation fraud in IMC lobbies. We disagree. The HRA does not have to wait for the first cases of fraud to be reported before it can promulgate regulations that otherwise would be reasonable to meet its legitimate interest in preventing fraud.

*Id.* Approximately 1,500 automobiles turn onto the access road from River Road ev-

ery day at KAPL. Trial Transcript at 92. The sheer number of automobiles using the road suggests that a legitimate risk of an accident occurring due to a driver braking to obtain a leaflet from a KAP member does exist. Thus, the Court must conclude that safety and liability are rational bases for prohibiting KAP from continuing to leaflet on KAPL property.

In so holding, the Court also determines that the restriction is not content-based. Initially, it must be noted that the restriction does not favor one group over another, but rather equally prohibits all groups from entering KAPL property. Judge Kaufman's language in *Eastern Connecticut*, which criticizes the use of an absolute ban on expression as a means of obtaining content-neutrality, is not in conflict with KAPL's action. *Eastern Connecticut* merely indicates that the state must present the court with reasons for the necessity for such an absolute ban prior to determining its constitutionality. *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d at 1053. Here, KAPL in fact has presented the Court with several bases for its action—bases which this Court accepts as reasonable. More important, at trial defendants presented five witnesses, all current or former KAPL employees integrally involved in the decision to ban access to the property, who testified that the bases for prohibiting further entry onto KAPL property were concern over safety, liability and labor relations. *See* Trial Transcript at 89–252. Plaintiffs, however, did not present one witness who could at all substantiate any alternative motive on the part of KAPL. In claiming that the prohibition was implemented as a result of the increased media coverage and publicity of KAP's activities, plaintiffs rely totally on inference. None of the defense testimony is contradicted or impugned. The mere fact that several events in which KAP participated received media coverage and that one KAPL clerical employee resigned in

---

**13.** Prior to 1980, KAPL prohibited KAPL employees from using a baseball diamond, which at the time was within the grass field adjacent to the parking lot, for the same liability concerns as are expressed now. Trial Transcript at 222.

light of KAP's demonstrations is not adequate to call into question the sworn testimony of the KAPL witnesses. This Court will not draw a causal connection between this increased attention and KAPL's action, thus questioning the veracity of KAPL's witnesses, on such speculative inference. Consequently, the Court finds no basis upon which to consider the prohibition to be content-based.

Plaintiffs' reliance on Judge Kaufman's decision in *Eastern Connecticut* and on the circuit's later decision in *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767 (2d Cir.1984), is misplaced. Although factually both cases found the nonforums therein discussed to be not incompatible with the proposed speech, both cases are clearly distinguishable from the present case. In *Eastern Connecticut,* the nonforum was an unused rail bed which the state wished to preserve for potential future transportation purposes. While the rail bed was technically closed to the public, "hikers, bicyclists, and others frequently use[d] it for recreational purposes." *Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d at 1052. In holding that the plaintiff therein could use the rail bed for a "Railathon" demonstration, Judge Kaufman noted that "[a]lthough the state may indeed protect its 'special interest' in preserving the corridor for future transportation purposes ..., we are unable to discern any interference with that purpose resulting from the proposed Railathon." *Id.* at 1055.

The facts that distinguish *Eastern Connecticut* from the present case are apparent. First, in *Eastern Connecticut,* the state was making no present use of the property in question. Its only purpose in attempting to restrict use of the property was to preserve it for possible future use. In no way could a Railathon demonstration, which consisted solely of an organized march along the rail bed, interfere with this long term goal. Moreover, while Judge Kaufman did apply nonforum analysis to this property, it is clear from the facts that at no time did the state restrict access to the property, even though it was technically closed to the public. Here, however, the purpose for which KAPL is being preserved is in no way limited to future operations. Rather, it is being maintained for the current orderly operation of classified government and private sector research. In addition, while KAP was permitted on the property, it cannot be said that such access was unrestricted or unmonitored. Thus, *Eastern Connecticut* cannot be considered controlling. Similarly, in *Gannett,* where the Circuit classified the placement of newspaper vending machines in nonforum commuter rail stations as not incompatible with the property therein, the factual situation, on its face, is clearly distinguishable. Obviously, rail stations provide an extremely appropriate forum for the sale of newspapers. *E.g., Wright v. Chief of Transit Police,* 558 F.2d 67, 68 (2d Cir.1977); *Wolin v. Port of New York Authority,* 392 F.2d 83, 90 (2d Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). It is equally obvious that such a forum is not at all similar to a classified nuclear research facility.

Finally, KAPL's decision has not eliminated all possible alternative forums for expression. While defendants have refused a request to permit leafletting on the walkway between the parking lot and the checkpoint, a request which this Court believes is equally inappropriate considering the character of the property, KAP may still distribute leaflets at the same site where it initially distributed them—on the south side of River Road, across the road from KAPL. While this site apparently enables KAP to distribute less than 100 leaflets a day, as opposed to the 250 that it distributed daily at the access road, Karen Rembert, plaintiffs' own witness, and the employee who resigned from KAPL due to KAP's message, testified that the most influential demonstration in which KAP partook was the prayer vigil held in May of 1982—a demonstration which was held on the south side of River Road. Trial Transcript at 69. It therefore appears to this Court that the south side of River Road, as

well as the numerous other means for KAP to express its views to the public, provides KAP with a constitutionally adequate forum for expression, and thus the Court denies plaintiffs' request for relief.

### IV

For all the foregoing reasons, this Court concludes that the plaintiffs have failed to establish any claims set forth in their complaint. Accordingly, entry of judgment in favor of defendants is directed.

It is so Ordered.