KNOLLS ACTION PROJECT, M. Louise McNeilly, Sister Danielle Bonetti, Maureen Casey, David Miller, Dr. Jean M. Haynes, Father Bill Ryan, Father Paul Smith, Frank Zollo, Father Jay Murnane, Sister Mary Theresa Streck, Plaintiffs-Appellants,

v.

KNOLLS ATOMIC POWER LABORATORY ("KAPL"); John S. Herrington, United States Secretary of Energy; T.J.E. Glasson, Public Information Director, "KAPL"; Mr. Cox, Vice President of General Electric, Defendants-Appellees.

No. 1168, Docket 85–6040.

United States Court of Appeals, Second Circuit.

Argued May 10, 1985.

Decided Aug. 26, 1985.

Steven R. Shapiro, New York Civil Liberties Union, New York City, for plaintiffs-appellants.

Victor A. Lord, Albany, N.Y. (McNamee, Lochner, Titus & Williams, P.C., Frederick J. Scullin, Jr., U.S. Atty., David R. Homer, Albany, N.Y., of counsel), for defendants-appellees.

Before MESKILL, KEARSE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Knolls Action Project ("KAP" or "the Project") and several KAP members appeal from Judge Miner's denial of their claims for declaratory and injunctive relief allowing them to continue to distribute literature on the grounds of the Knolls Atomic Power Laboratory ("KAPL"), 600 F.Supp. 1353. We affirm Judge Miner's decision holding that they have no First Amendment right to enter that property for such purposes.

### BACKGROUND

KAP is an organization based in Albany, New York and has approximately thirty active members. Its purpose is to alert the local community to the dangers of nuclear war and to advocate disarmament. The Project disseminates its message through newsletters, demonstrations, and leaflets. At issue is KAP's leafletting activity at KAPL, a nuclear research facility in Niskayuna, New York, owned by the United States and operated by the General Electric Company ("GE").

KAPL's Niskayuna site employs approximately sixty federal employees and 2,000 GE employees under the general direction of the Department of Energy. While the record does not reflect the precise nature of the work done at the site, the Project contends that KAPL has played a major role in the development of a nuclear reactor for the Trident submarine.

Part of KAPL's Niskayuna facility is surrounded by a fence, and entry into this area is possible only through a gatehouse. South of the gatehouse and outside the fence, but still on KAPL property, is the main parking lot. Approximately 80 percent of KAPL employees enter the parking lot through a paved entryway at the southwest corner of the facility. The employees generally turn left from River Road, a state-owned road south of the facility, into the entryway. The southern boundary of KAPL property runs about twenty feet north of River Road and is marked with a white line on the paved entryway. Signposts designate the boundary on the grassy area separating River Road from the parking lot. At the northern edge of the parking lot is a cement walkway extending about 75 feet to either side of the gatehouse, which KAPL employees use after leaving their cars.

KAP began leafletting at the Niskayuna facility in 1978. In the beginning, the KAP members stood on state property on the south side of River Road across the street from the entryway [1] and handed out leaflets to drivers about to make the left turn into the entryway. The leafletting appears to have caused traffic to back up along River Road, and sometime prior to 1981 the KAP members began to stand in the entryway itself. This move allowed them to distribute leaflets to drivers who had already made the left turn and were about to enter the parking lot. The leafletting was conducted by one or two persons on Friday mornings between 7:00 and 8:00 as KAPL employees arrived. Occasionally, KAP members would cross the line into KAPL property, but the KAPL security personnel appear to have been indifferent to such minor intrusions.

In January, 1981, Lance Stewart, the head of security at the Niskayuna facility, told the leafletteers to move further into the entryway and thus onto KAPL property. Stewart testified that he was concerned that if drivers continued to stop and take the leaflets immediately after making the left turn into the entryway, a rear-end collision could result. He noted that a KAPL employee had complained of this potential safety problem. KAP thus began to leaflet on KAPL property at KAPL's suggestion and continued to do so for some eighteen months. The KAP leafletting was not disruptive, and there were no accidents or other incidents associated with it.

In late June, 1982, Albert Kakretz, KAPL's general manager, received a letter from a KAPL employee named Bill Fisher complaining of a potential safety hazard from the Project's leafletting and threatening to sue KAPL should an accident occur. The letter also expressed strong disapproval of the Project's political message.[2] Kakretz testified that after receiving this let-

---

1. We, like the district court and the parties, will confine our discussion to the west entryway, as 80 percent of the employees use it. There is no indication that the situation at the east entryway, where KAP occasionally leaflets, differs significantly.

2. The letter read:

This is to bring to your attention how one of your employees (and I suspect *many* more too) feels about the now regular Friday morning gate demonstrators. I for one highly resent having to be extra cautous [sic] of them in and close alongside the driveways. At the east gate this morning they even had a num- ber of small (perhaps 5–6 years old) along the sideline.

KAPL should not continue to ignore these people's tactics. What about some "police line" sawhorse barriers or something like that to keep them back & *particularly out of the driveway center?* Sooner or later someone will get hurt. You can be certain that if I happen to get into an accident due to their presence, I'll sue KAPL et al for contributing to the situation. And with a good lawyer I'd have a good case.

Many of us had our fill of this kind of thing in the 60's.

Lets move on this now!

ter, he asked an aide "to look into the situation." After meeting with Stewart and Jamie Gearon, KAPL's general counsel, Kakretz informed KAP that it could no longer leaflet on KAPL property. The Project then requested permission to leaflet on the walkway at the north end of the parking lot, but KAPL refused this request.

Since then, KAP's leafletting has been limited to the south side of River Road, the original site. KAP asserts that this site is more dangerous and less effective for disseminating its message. It claims that, since the ban took effect, the number of leaflets distributed per week has declined from 250 to less than 100. It therefore brought the instant action seeking an injunction permitting it to leaflet in the entryway or on the walkway.

## DISCUSSION

KAP proffers three arguments based on the First Amendment. First, it contends that KAPL, by permitting the leafletteers to enter its property, transformed a portion of its grounds into a limited public forum. Second, it argues that government property that is not a public forum may not be completely closed to First Amendment activity unless such activity is unavoidably incompatible with the character of the property. Finally, KAP argues that KAPL's ban on leafletting was unconstitutional because it was content-motivated.[3]

KAP's first argument is easily dismissed. KAP does not, nor could it, argue that KAPL or its parking lot is a traditional public forum. Rather, KAP contends that KAPL's parking lot has become a "designated" public forum within the meaning of *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

In *Perry* the Court defined government property as falling into three categories: (i) traditional public forums such as streets and parks; (ii) "designated" forums; and

(iii) nonforums. As to the first, "[i]n these quintessential public forums, the government may not prohibit all communicative activity," *id.* at 45, 103 S.Ct. at 955, but may enforce content-neutral time, place, and manner regulations narrowly drawn to serve a significant governmental interest and to allow adequate means of communication. Content-based exclusions can be justified only when they serve a compelling governmental interest and are narrowly tailored to achieve it. The second *Perry* category involves property made available or "designated" by the state for expressive activity. "Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* at 46, 103 S.Ct. at 955. The third category involves property "which is not by tradition or designation a forum for public communication." *Id.* KAP argues that KAPL transformed its non-secure areas outside the fence into a "designated" forum when it invited the leafletteers to use the entryway for leafletting.

 We agree that when the government opens up its property to speakers it becomes subject to First Amendment limitations. However, we reject the claim that whenever government attempts to accommodate the desires of a speaker by not enforcing its maximum legal rights to exclude the public from certain property, it forever forfeits those rights. To hold otherwise would deter officials from making generous concessions to groups such as KAP and encourage the invocation of all possible rights to exclude at the earliest possible moment. We see no benefits to government or to speakers in such a rule, and believe that *Perry* rejected it in stating that a "designated" forum need not "indefinitely retain" that character. *Id.* at 46, 103 S.Ct. 955. In the instant case, therefore, whatever previous use has been allowed

---

**3.** The defendants conceded that their actions are subject to First Amendment limitations. Therefore, we need not decide whether the limited government control over the property in question is sufficient to subject KAPL to First Amendment constraints.

does not foreclose KAPL from asserting its rights at this time.

KAP's second argument is that KAPL may not totally ban leafletting on its parking lot regardless of whether it is a public forum. It bases this claim on dicta in our decision in *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1054 (2d Cir.1983), to the effect that the state may, where the manner of expression is "basically incompatible" with the character of the government-owned facility, impose reasonable time, place, and manner restrictions, but may bar speech altogether only in cases of "unavoidable incompatibility." KAP argues that because KAPL has not demonstrated that leafletting in the parking lot is "unavoidably incompatible" with KAPL's functions, it may impose only reasonable time, place, and manner restrictions.

We disagree. Controlling Supreme Court precedents are not consistent with a rule that imposes on government the burden of proving that every suggested expressive activity is unavoidably incompatible with the particular use of nonforum premises. The Court has on many occasions noted that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966). *See Perry*, 460 U.S. at 46, 103 S.Ct. at 955. The Court has upheld complete bans on speech at government facilities without engaging in the elaborate analysis KAP advocates. *See, e.g., Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military base); *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (jail). In fact, the recent decision in *United States v. Albertini*, —— U.S. ——, ——, 105 S.Ct. 2897, 2904, 86 L.Ed.2d 536 (1985), upheld the absolute exclusion of a person from a military base, even during an "open house," without a showing that such a bar was "essential" to security.

■ That KAP seeks to leaflet only in the parking lot does not alter our analysis.

In *Adderley* the state was allowed to prohibit use of a jail driveway for public forum purposes in circumstances indistinguishable from the present case. Moreover, the present case entails a far less compelling First Amendment claim than was rejected in *Greer*, where the particular military training base was largely open to the public. By contrast, the district court found that "KAPL is a restricted, classified government/private sector venture performing highly sensitive work for the Navy in the field of nuclear research. Other than in a few limited instances, it has a history of barring all individuals from access if their presence is not business related." Given the nature of the KAPL facility, government may, through content-neutral regulations, exclude unauthorized persons from the premises regardless of their desire to engage in expressive activity.

Finally, KAP contends that KAPL's decision was impermissible because it was motivated by a dislike of the content of KAP's message and that a total ban on expression on nonforum property must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view," *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. Some circumstantial evidence supports KAP's position that the exclusion was not content-neutral. KAP points to the increased publicity surrounding the anti-nuclear movement in 1982 and claims that it was beginning to achieve some success just before KAPL's decision. Several events that KAP organized or participated in also attracted media coverage around that time. In addition, a KAPL clerical employee resigned three weeks before KAPL instituted the ban and issued a statement citing KAP's demonstrations and her resultant heightened concern about nuclear war as the motivation for her resignation. Finally, the employee's letter to Kakretz expressed disapproval of KAP's political message, *see supra* note 2.

■ However, Judge Miner concluded that "the restriction is not content based," and we cannot say that his finding is clearly erroneous. The ban is not limited to

KAP but extends to all groups. KAPL offered testimony by five persons involved in the decision to prohibit leafletting on the property, and each denied that KAP's message played a role in the decision. Judge Miner found further that the ban was related to reasonable concerns about safety, liability, and labor relations. Kakretz testified that he was concerned about possible liability were a KAP member injured while on KAPL property. He also testified that KAPL as a matter of policy did not permit labor union solicitation on its property, and he was concerned that the union would use the KAP leafletting as a precedent to circumvent this policy. *See NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956).

KAP dismisses these concerns as speculative and pretextual. Judge Miner found otherwise, however, and that finding is not clearly erroneous.

Affirmed.