**ROCK AGAINST RACISM, Plaintiff,**

v.

**Benjamin R. WARD, in his official capacity as Police Commissioner of New York; George Scarpelli, in his official capacity as Chief of Operations for Department of Parks; Sheldon Horowitz, in his official as Special Events Director for the Department of Parks, Robert Russo, in his official capacity as Assistant Parks Commissioner for Citywide Services, New York City Department of Parks and Recreation; Joseph Killian, in his official capacity as Program Director for the Mall Bandshell of the Bethesda Terrace area of Central Park in the City of New York, Department of Parks and Recreation; Mayor Edward Koch, in his official capacity as the Mayor of the City of New York; and the City of New York, Defendants.**

No. 85 Civ. 3000–CSH.

United States District Court,
S.D. New York.

April 16, 1987.

Noah A. Kinigstein, New York City, for plaintiff; James Fossbinder, Tuscon, Ariz., of counsel.

Peter L. Zimroth, Corp. Counsel of the City of New York, New York City, for defendants; Jonathan Pines, Lina Liberatore, of counsel.

HAIGHT, District Judge:

The plaintiff in this action, Rock Against Racism ("RAR"), is an unincorporated association which describes itself as "dedicated to the espousal and promotion of anti-racist views". Defendants are the City of New York, Edward I. Koch, Mayor of the City of New York, Police Commissioner Benjamin Ward, and four officials of the City's Department of Parks and Recreation (George Scarpelli, Sheldon Horowitz, Joseph Killian and Robert Russo). All individual defendants are sued in their official capacities only. The defendants are sometimes collectively referred to as "the City."

Since 1979, RAR has sponsored a yearly "musical/political event" at the Naumberg Bandshell in Central Park ("the Bandshell"), generally on a weekend in early May. Since 1985, RAR's attempts to obtain official permission to hold their May event have resulted in litigation before this Court.[1]

While other disputes exist, the main bones of contention have been the City's contention that RAR's amplified sound has been excessively loud and its sponsors conduct generally uncooperative; and RAR's resistance to what it perceives as City interference and obstructionism.

RAR's original complaint, filed on April 18, 1985, sought injunctive relief. The parties settled their differences, at least for the moment, and the May 1985 event was held.

In March 1986 the Department of Parks issued "Use Guidelines" for the Bandshell and, in late April 1986, RAR challenged the application of those guidelines to their May 4, 1986 event. That challenge was brought on by order to show cause before this Court, and on May 1, 1986, having considered the opposing affidavits and heard such testimony as time pressure allowed, I issued a Memorandum Opinion and Order partially granting and partially denying RAR's request for a preliminary injunction.[2] Familiarity with that opinion is assumed.

RAR filed an Amended Complaint on November 5, 1986 seeking a declaratory judgment "striking" the challenged regulations and also seeking compensatory and punitive damages. Defendants filed an Answer to the Amended Complaint on November 28, 1986. Following discovery, the Court heard approximately five days of testimony on RAR's claims for a permanent injunction against the Use Guidelines, and for compensatory and punitive damages. I consider the prior proceedings as part of the trial record. Rule 65(a)(2), F.R.Civ.P.

While the Amended Complaint roamed somewhat farther afield, the parties were directed to file pre-trial proposed conclusions of law supported by authority. I limit this opinion to those provisions of the Guidelines attacked in RAR's proposed conclusions.

For the reasons set forth below, I issue a permanent injunction enjoining defendants from applying certain portions of the Use Guidelines, deny an injunction as to others, and deny plaintiff's claims for compensation and punitive damages.

*The Use Guidelines*

The Use Guidelines ("the Guidelines") challenged by RAR were primarily authored by Joseph Killian, the first Program Director for the Mall, Bandshell, and Bethesda Terrace area of Central Park. Drafting the Guidelines was one of Mr. Killian's first responsibilities in his new job: he was hired in January 1986, and the Guidelines were promulgated under authority of the Commissioner of Parks on March 21, 1986.

The Guidelines are contained in a six page document typed on Parks Department letterhead and captioned "Use Guidelines for The Naumberg Bandshell in Central Park". The Guidelines set out Parks Department policy on twelve subjects: (1) Permits, (2) Hours/Dates of use, (3) Attendance, (4) Sound Amplification, (5) Insurance, (6) Vehicles, (7) Concession of Goods, (8) Revenue, (9) Safety, (10) Portable Toilets, (11) Cleanup, and (12) Evaluation.[3]

---

1. RAR's action in this Court is brought pursuant to 42 U.S.C. section 1983, alleging deprivation of rights guaranteed by the First and Fourteenth Amendments to the Constitution. Jurisdiction is proper under 28 U.S.C. section 1332.

2. An appeal taken by the City to the May 1, 1986 Order was dismissed as moot, RAR's May 1986 event having taken place in the interim.

3. The Use Guidelines were marked as Defendant's Exhibit F at the trial of this action. An additional subject area (distribution of litera-

ture) was addressed by the original Guidelines, but was later struck out by the Parks Department on counsel's advice that it represented an unconstitutional burden on Bandshell user's First Amendment rights. The struck paragraph is located on page four of Exhibit F. Testimony at trial indicated that the Parks Department is currently endeavoring to formally modify the Guidelines to reflect the absence of this subject area. Counsel for the City represented at trial, and I accept, that no effort will be made to restrict the distribution of literature at Bandshell events.

RAR challenges seven of the areas addressed by the Guidelines: Permits, Hours/Dates of use, Attendance, Sound Amplification, Insurance, Vehicles and Revenue. Each of the challenged subject areas is discussed more fully below.

On the first page of the six-page Guidelines, their purpose is described as being to assist sponsors of events at the Bandshell "in understanding their responsibilities; to prevent overuse, crowding, security problems and excessive noise; and to avoid conflicts with other users of Central Park." Those who intend to sponsor an event at the Bandshell are informed that if their proposed event fails to "meet" the Guidelines, they should "consider using an alternate site." Despite the advisory flavor of these introductory remarks, the parties agree that the Guidelines are intended as enforceable regulations. Events that conflict with the Guidelines will not be permitted at the Bandshell.[4]

RAR contends that the Guidelines are facially invalid, claiming that they operate as a prior restraint on the right of free speech. The evidence adduced at trial also requires consideration of certain of the Guidelines as applied to RAR.

*Discussion*

A. *First Amendment Law for Public Forums*

██ The First Amendment to the Constitution, as applied to the states through the Fourteenth Amendment, prohibits public authority from, *inter alia*, abridging the freedom of speech, or the right of the people peaceably to assemble, in places customarily used as forums for public speech. Central Park is unquestionably such a public forum.[5] Justice Roberts' oft quoted statement in *Hague v. C.I.O.*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1938) while establishing this proposition,

also provides an excellent backdrop for the present controversy:

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

The tension between an individual's relative (not absolute) freedoms of expression and assembly and public concerns of comfort, convenience, peace and good order is further defined in subsequent Supreme Court cases. Despite plaintiff's faint suggestion to the contrary, we deal in this case with content-neutral regulations. "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place and manner restrictions." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). " '[C]ontent-neutral' time, place and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theaters Inc.*, 475 U.S. 41, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986).

---

**4.** *See* the Evaluation section of the Guidelines, where sponsors of events are informed that "FAILURE TO FOLLOW THESE GUIDELINES CAN ... PROVIDE REASON TO DENY THE SPONSOR ... ANY AND ALL FUTURE BANDSHELL PERMIT APPLICATIONS."

**5.** It is possible that some facilities at Central Park do not fall within the definition of a "pub-

lic forum". In the present action, however, defendants have not suggested that the Naumberg Bandshell is not a public forum for First Amendment purposes. *See Wolin v. Port of New York Authority*, 392 F.2d 83, 90 (2d Cir.1968) (setting forth criteria for deciding whether a particular place is a public forum).

Once a governmental regulation is shown to impinge upon the First Amendment rights of an individual or group, government bears the burden of showing both the validity of the interests sought to be protected by the regulation, and the absence of less restrictive alternatives. *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1980); *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). The challenged regulation will be held unconstitutional unless the government proves that it is "narrowly tailored to further the State's legitimate interest." *Grayned v. City of Rockford*, 408 U.S. 104, 116–17, 92 S.Ct. 2294, 2303–04, 33 L.Ed.2d 222 (1972). *See also Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050 (2d Cir. 1983).

■ For First Amendment purposes, "speech" extends to musical expression, as well as the spoken word. *Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir.1984).

Against these general considerations, I turn to the particular regulations at bar.

B. *Sound Amplification*

The Guideline section regarding Sound Amplification declares that the "DEPARTMENT OF PARKS AND RECREATION IS TO BE THE SOLE AND ONLY PROVIDER OF SOUND AMPLIFICATION." This declaration entails two discrete requirements: first, that sponsors use a sound amplification system provided by the New York Sound Company ("New York Sound"), a vendor selected by the Parks Department; and second, that the sound amplification system be operated by a technician employed by New York Sound.

In my May 1, 1986 Opinion, I preliminarily enjoined the defendants from enforcing these requirements against RAR. In doing so, I noted that First Amendment "protection extends not only [to] the words and songs presented [by RAR,] but also [to] the sound which actually emanates from the amplification system itself and who controls it."

In preliminarily enjoining the City from enforcing the sound amplification regulations in respect of RAR's May 1986 event, I acted on the basis of a relatively sketchy record. All that emerged with clarity was that the City intended to impose upon RAR a sound system of unknown quality, seemingly under the sole control of an individual owing his allegiance to a City contractor and not to RAR as sponsor of the event. These circumstances, in my view, entitled RAR to preliminary injunctive relief at that time and with respect to that event.

The plenary trial on plaintiff's motion for a permanent injunction, now concluded, permits more detailed findings of pertinent facts, and places RAR's constitutional challenge to the sound amplification regulations in perspective.

The Naumberg Bandshell has become one of the most popular and heavily used outdoor entertainment facilities in Central Park. The Bandshell "season" begins in mid-Spring and runs until early Fall. Prior to 1986, a number of Parks Department branches and other City agencies were involved in processing applications for, and supervising the use of, the Bandshell. The Bandshell lies at the northern end of the Mall, between the Mall and the Bethseda Terrace and Fountain. The Bandshell itself consists of a raised stage extending out from an acoustic shell, which faces a well-defined paved "concertground", which is in turn surrounded by grassy areas, slight elevations, and trees. To the west of the concertground lies the Sheep Meadow, and ultimately the towers and battlements of Central Park West.

In January 1986 Joseph Killian was hired to be the Bandshell's first program director. Killian had experience as a performer and a producer of outdoor entertainments. In addition to drafting the guidelines which form the subject matter of this litigation, Killian also undertook a search for a sound amplification vendor with whom the City could contract to furnish amplification at the Bandshell. For

this purpose Killian retained the services of an experienced sound consultant, Gary Floyd. Killian and Floyd gave evidence at the trial.

After researching the Bandshell's amplification requirements and canvassing local sound companies, Floyd recommended to Killian that the City retain New York Sound. Killian accepted that recommendation. It is apparent that both Killian and Floyd were motivated by a desire to obtain top-flight sound equipment and experienced operators. Quality, not price, was stressed.

I find that in retaining New York Sound as its vendor, the City had two objectives: to place control of the volume in its hands; and to ensure the quality of sound at Bandshell events.

RAR does not accept the legitimacy of the second objective professed by Killian. Indeed, at oral argument counsel for RAR seemed to suggest that the City's entire process of retaining a sound company and issuing guidelines was an effort to avoid a purported settlement of its disputes with RAR in May 1985. This perception does not square with the evidence. Killian and Floyd worked hard to ensure quality sound at the Bandshell as well as ultimate control over the volume level.

The RAR May 1986 event, the first of the 1986 Bandshell season, was (by virtue of this Court's preliminary injunction) the only event that season not amplified by the New York Sound system and engineer. The other 50 to 60 events, which ran the full cultural gamut from grand opera to salsa to reggae, all used the New York Sound system. Despite understandable initial misgivings on the part of groups accustomed to arranging for their own sound amplification, Killian testified, and I find, that the sponsors of 1986 events at the Bandshell were uniformly pleased with the quality of the amplified sound. Indeed, at least one sponsor thereafter retained New York Sound at other events.

The evidence shows that amplified sound at a concert consists of two basic components: sound quality or "mix", and sound volume. A series of stage microphones are placed throughout the performers. The sounds picked up by these microphones are fed into a "mixing board" at which New York Sound's engineer presides. His adjustments at the board control the mix of sound which is then amplified through a series of speakers. The City's practice for events at the Bandshell is to give the sponsor autonomy with respect to the sound mix: balancing treble with bass, highlighting a particular instrument or voice, and the like. The New York Sound engineer does all that he can to accommodate the sponsor's desires in those regards. For the New York Grand Opera performances, New York Sound "patched" in to its system particular microphones which Maestro LaSelva preferred and New York Sound did not have in its inventory.

It is the fact that the New York Sound engineer can control the volume of the amplification, presumably by turning a knob or knobs. However, Killian, who attends most if not all of the Bandshell events, makes it a practice to confer with the sponsor if any questions of excessive sound arise, before taking any corrective action.

The City's concerns with respect to sound generated by Bandshell events are that the sound amplification be sufficient to reach all listeners within the defined concertground; but that the sound not extend unnecessarily beyond the listening area into adjoining sections of Central Park, where other persons might be pursuing other forms of recreation. The City is also concerned with excessive sound annoying residents of buildings which adjoin the park. The RAR concerts of 1985 and 1986 generated a number of complaints from such residents.

That the City has a legitimate governmental interest in controlling excessive sound cannot be gainsaid. A city's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *City of Renton supra,* citing and quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976). Excessive noise is a recognized threat to the quality of urban life. "The reduction of

noise, particularly in a noise polluted city like New York, is a particularly compelling government interest." *Weil v. McClough,* 618 F.Supp. 1294, 1296 (S.D.N.Y.1985). Justice Marshall put it succinctly in *Grayned, supra,* 408 U.S. at 116, 92 S.Ct. at 2303: "If overamplified loud speakers assault the citizenry, government may turn them down."

The City has undertaken to regulate noise in its parks by general Rules and Regulations, D.Ex.G at trial, which provide in Section 15(a):

> "No person shall make or cause any excessive or unusually loud noise which disturbs, injures or endangers the comfort, peace, health or safety of any person or disturbs or causes injury to plant or animal life, or damage to business or property."

This regulation may not be challenged for unconstitutional vagueness. *Cf. Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (ordinance forbidding amplification of "loud and raucous noises" upheld).

 Sponsors of events at the Bandshell are entitled under the First Amendment to content-neutral regulations which guarantee them a level of sound amplification reasonably necessary to carry their message to the outer boundaries of the audience area. However, a user has no right, First Amendment or otherwise, to turn up the volume as loud as it wishes. The Supreme Court struck the amplification balance in *Kovacs* at 81–82, 69 S.Ct. at 451:

> "Unrestrained use throughout a municipality of all sound amplifying devices would be intolerable. Absolute prohibition within municipal limits of all sound amplification, even though reasonably regulated in place, time and volume, is undesirable and probably unconstitutional as an unreasonable interference with normal activities."

And again at 87, 69 S.Ct. at 454:

> "Opportunity to gain the public's ears by objectionably amplified sound on the streets is no more assured by the right of free speech than is the unlimited opportunity to address gatherings on the streets." (footnote omitted)

 I accept that RAR has a First Amendment right to the use of a sound amplification system capable of producing the quality of sound it desires, and the level of sound necessary to reach throughout the audience area. I do not detect a First Amendment right to own the sound amplification system used. The City's implementation of the Bandshell guidelines provides for a sound amplification system capable of meeting RAR's technical needs and leaves control of the sound "mix" in the hands of RAR. Nothing further is required by the First Amendment.

RAR's interest in using its own equipment and sound engineer is, in the circumstances revealed by the evidence, "attenuated" at best, *cf. Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 496, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982), and obviously cannot be justified by a desire to engage in unrestrained and excessive noise, which government may validly regulate.

The sound amplification regulations are sufficiently narrowly tailored to further a legitimate state interest. The evidence shows that prior efforts on the part of the Parks Department's representatives to reduce RAR's sound levels have been nonavailing and confrontational. Directing a New York Sound Company technician to turn down the sound in case of need is less intrusive than pulling the plug, which evidence at trial indicated was the City's sole means of enforcing the general sound regulations prior to promulgation of the Guidelines.

 I conclude that the sound amplification guidelines are constitutional because they do not impinge upon a protected right. Even if some slight interest in using familiar equipment exists, the guidelines are narrowly tailored to further a legitimate governmental interest.

One can hypothesize an unconstitutional application of the amplification guidelines to a particular sponsor such as RAR. Arbitrary reduction of sound level below that necessary to carry RAR's message to the Bandshell audience would be an example. However, on this record RAR's challenge

must be facial, which means in this context "a claim that the law is 'invalid *in toto* —and therefore incapable of any valid application.'" *Hoffman Estates, supra*, at 494 n. 5, 102 S.Ct. at 1191 n. 5, citing and quoting *Steffel v. Thompson*, 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974). Theoretical possibilities that a municipality may at a future time enforce a valid ordinance in an unconstitutional manner do not give rise to a present constitutional claim. *Id.* 455 U.S. at 503 n. 21, 102 S.Ct. at 1196 n. 21.

Accordingly RAR's constitutional challenge to the sound amplification provisions of the Bandshell guidelines fails.

### C. *Permits and Fees*

The guidelines require Bandshell users to obtain permits. Certain fees are imposed. The provisions RAR challenges read as follows:

"PERMITS

Sponsors planning to use the Naumburg Bandshell must obtain the following permits:

1) *Special Event Permit*-Available from: Bandshell Program Director. There is a non-refundable processing fee, minimum $50, maximum $100. A cleanup bond must also be posted. A liability [sic] may be necessary.

2) *Central Park Bandshell Permit* -Available from: Bandshell program Director, The Arsenal Rm. 103, 830 Fifth Ave., N.Y., N.Y. 10021. The Department of Parks and Recreation is the sole and only provider of sound amplification. A user fee of $100 per performance hour, plus a one hour sound check is charged. This fee is due within seven days of receipt of a signed Bandshell Permit. It must be payed [sic] with a certified check or money order (no personal checks or cash) made payable to Cultural Council Foundation/Concert Fund."

3) *Vehicle Permits*-Available from: Bandshell Program Director (SEE ABOVE). There is no fee for vehicle permits.

"A liability may be necessary" as stated in subparagraph (1) means, as the body of the Guidelines makes clear, "a liability *pol-icy* may be necessary." The issue of liability insurance is discussed separately *infra*.

First Amendment cases sanction the imposition of permit or license requirements as prerequisites to speech in public forums. Local authorities have a valid interest in advance notice of public events, "to assure proper police protection and minimal inconvenience to the general public.... Licensing fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose." *Eastern Connecticut Citizens Action Group, supra*, at 1056.

■ When an application to use public property necessarily generates bureaucratic processing, communications and meetings, a "detailed time and motion study" is not required to prove that the cost to the City equals or exceeds the fee. *United States Labor Party v. Codd*, 391 F.Supp. 920, 921 (E.D.N.Y.1975), reversed on other grounds, 527 F.2d 118 (2d Cir.1975).

■ A fee requirement involving a First Amendment right must be "closely scrutinized" to see whether it is reasonably necessary to a legitimate goal. *Bullock v. Carter*, 405 U.S. 134, 144, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). However, the rule in the Second Circuit is that a fee which does not exceed the cost to the City is reasonable and enforceable, in the absence of proof of the applicant's indigence "so pervasive as to make payment of even this modest fee beyond its reach." *Codd, supra*, at 527 F.2d 119; *Eastern Connecticut Citizens Action Group*, supra, at 1056.

■ In *Invisible Knights of the Ku Klux Klan v. City of West Haven*, 600 F.Supp. 1427 (D.Conn.1985), the court appears to regard permit fee regulations as facially invalid if they do not specifically exempt indigents. *Id.* at 1435. I do not read the Second Circuit cases that way. A fee required of all users is presumptively valid. If challenged, the municipality must demonstrate "its necessity as a means of offsetting expenses associated with applications for access to property under its control." *Eastern Connecticut Citizens Action Group* at 1056. If that burden is met,

the applicant must plead and prove inability to pay.

■ Viewed in the light of these authorities, the processing fee is constitutional. The regulation provides for a fee of "minimum $50, maximum $100." In practice, the City looks to the predicted attendance given by the sponsor on the application. If that attendance is between 1000 and 3000 people, $50 is charged; from 3001 to 4000 $75 is charged; and on an application predicting an attendance in excess of 4000 the sponsor is charged $100 for processing. Killian, Tr. 543.

RAR—somewhat optimistically, it would seem—regularly predicts crowds in excess of 5000 at its event. A number of musical groups participate. A significant number of vehicle arrangements must be made. A number of offices and agencies are necessarily concerned with a gathering of this size. The evidence makes it clear that intra-agency meetings are necessary together with meetings with representatives of the sponsor. I find, just as Judge Weinstein did in *Codd, supra,* that the actual cost to the City in processing such an application undoubtedly exceeds $100.

■ The "user fee" for the City-provided sound system "of $100 per performance hour, plus a one hour sound check" does not fare as well. Although in the preceding section of this Opinion I have sustained against facial constitutional attack the City's right to require sponsors to use the New York Sound System, the Second Circuit cases make it clear that the City cannot recoup from a First Amendment user an amount in excess of the costs actually incurred by the City with respect to that use. The evidence shows that under its contract with New York Sound the City is billed $400 for each event New York Sound services at the Bandshell, regardless of duration. A six-hour RAR event, when coupled with a one hour sound check, would result in a charge of $700: almost twice the cost incurred by the City under its contract with New York Sound. This fee is facially invalid. I need not theorize upon what different sound user fee arrangement might pass constitutional muster.

■ The required cleanup bond is facially valid. I find from the evidence that failure of a sponsor to dispose of event-generated litter imposes direct overtime costs upon the Parks Department's limited work force. The City's practice, at least in so far as RAR is concerned, has been to require a $1000 clean up bond. Each year that amount has been returned to RAR, upon certification that the post-event clean up was adequate. A $1000 clean up bond is reasonable in amount, given the potential City employee overtime if the sponsor does not clean up. The return of the full amount to the sponsor who complies with clean up requirements safeguards the sponsor from any significant financial loss. RAR complains that it has had to wait too long for its refunds. This is an inevitable consequence of dealing with the bureaucracy of a large municipality. There is no evidence that RAR had to wait longer than anyone else.

■ RAR has not proved indigence in the case at bar. Since 1979, RAR has paid the filing fees and posted the clean up bonds. It hardly follows that because an unincorporated association of volunteers does not conduct a regular course of business, it is without fund-raising capacity. Prior to the RAR Central Park event, it has been RAR's practice to "hold one or two or as many as possible—we hold benefits in local clubs, indoor spaces, where we can charge people ..." Thompson, Tr. 97–98. These funds are available for payment of fees, and also have been used by RAR in the past to rent sound equipment. *Id.* at 98.

I decline to hold the Guidelines facially unconstitutional on this ground. I further find that the processing fee and clean up bond costs are not unconstitutional as applied to RAR.

■ The vehicle permits, for which there is no fee, are constitutionally valid. I find from the evidence that, particularly on weekends when the park is closed to vehicular traffic, it is important for the police to identify and control the vehicles using park roads for special events. Vehicle permits advise the City of details concerning the

vehicle and the driver. This is necessary to control entrance and egress and permit the tracing of vehicles in the event of claims or violations.

### D. *Insurance*

The insurance requirement contained in the Guidelines provides, in pertinent part, that "many events are required to have in effect at all times insurance in the amount stated on the Special Event Permit." This requirement is invalid for two reasons. First, it impermissibly vests unfettered discretion in Parks Department administrators responsible for issuing special event permits. Second, the City defendants have not shown that it is narrowly tailored to further legitimate state interests.

### (i) Impermissible discretion

Excessive delegation of the state's power to limit access to public forums—or to abridge any other aspect of individual liberty protected by the Fourteenth Amendment—has long been held unconstitutional. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana,* 379 U.S. 559, 569, 85 S.Ct. 476, 483, 13 L.Ed.2d 487 (1965); *Wolin v. Port of New York Authority,* 392 F.2d 83, 93 (2d Cir.1968). Clear and definite standards governing the exercise of delegated authority are necessary to protect the constitutional rights of those subject to the state's regulatory power. *Cf. Eisner v. Stamford Board of Education,* 440 F.2d 803, 809 (2d Cir.1971) (Board of Education's policy statement on distribution of written material on school grounds held "neither overbroad nor unconstitutionally vague, so far as it prescribes *criteria* by which school officials may prevent the distribution ... of written or printed matter.") (emphasis added)

The insurance requirement contained in the Guidelines provides no criteria whatsoever for the exercise of administrative discretion. It simply states that insurance "may" be required, without specifying the circumstances which will lead Parks Department administrators to condition use of the Bandshell on the event sponsor's willingness and ability to obtain a suitable insurance policy.

Furthermore, the insurance section of the Guidelines is ambiguous on the type of insurance that may be required; sponsors are told that the City must be named as additional insured on liability and property damage policies, and that the City must be the sole party insured on "the" fire and extended coverage policy. Whether this language indicates that a fire and extended coverage policy is mandatory while liability and property damage policies are not is unclear at best. This uncertainty further obfuscates the scope of the delegated authority.

The lack of concrete, ascertainable standards to guide the Parks Department's administration is fatal to this aspect of the Guidelines, which is facially invalid.

### (ii) Least restrictive means

Whether permission to use a public forum can be conditioned on obtaining an insurance policy has been recently addressed by the Second Circuit. In *Eastern Connecticut Citizens Action Group v. Powers, supra,* the court held a requirement of $750,000 in liability insurance to be unconstitutional, noting that "[w]hile the state has a legitimate interest in protecting itself from liability for injuries associated with the use of its property", the state bore the burden of proving that the insurance requirement "represent[ed] the least restrictive means of serving that interest." *Id.* at 1056. Of course, if the insurance requirement does not impinge on the plaintiff's First Amendment rights, the City is not required to justify the policy.

Impingement on plaintiff's First Amendment rights was proven at trial.[6] RAR presented uncontroverted evidence that they were unable to obtain a special event

---

[6]. RAR did not make the necessary showing of impingement on its First Amendment rights at the preliminary stage of this action, and thus the defendants were not enjoined from enforcing this regulation against RAR's May 1986

event. The defendants chose not to enforce the insurance requirement, for reasons which are unclear. Perhaps they were merely exercising the broad discretion accorded them by the Guidelines.

liability insurance policy in May of 1986. Their inability to obtain insurance was linked to two factors; the reluctance of insurance underwriters to write special event policies for events in Central Park,[7] and the inability of RAR to pay for any sizable insurance policy.[8]

The City argues that since the insurance requirement was not enforced against RAR in 1986, RAR lacks standing to challenge the requirement in this action. *See* note 6, *supra*. This argument is without merit. It is uncontroverted that RAR intends to sponsor its May event at the Bandshell every year it is able to do so. That intention alone is sufficient to confer standing on a plaintiff challenging regulations which would deny it access to its chosen public forum, when those regulations provide no indication that they will not apply to the plaintiff. *See Los Angeles v. Lyons,* 461 U.S. 95, 103, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (standing to seek injunctive relief depends on a showing of actual or threatened injury); *See also Schaumburg v. Citizens for Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (broad standing conferred on plaintiffs who challenge city enactment on First Amendment overbreadth grounds).

Because impingement on RAR's First Amendment rights by an insurance requirement is demonstrated on this record, the burden falls on the City to show that the requirement represents the least restrictive means of achieving its legitimate ends. Here, the City has not done so.

The City's evidence on this point is limited to the uncontroversial proposition that events on public property entail some risks—including the risk that the City might be held liable for damage to person or property. *See* Killian, Tr. 541. In *East-*

ern Connecticut Citizens Action Group, supra, the Court specifically noted that the "state's interest in protecting itself from liability for injuries associated with the use of its property" was legitimate. *Id.* 723 F.2d at 1056. The City's professed interest in minimizing its exposure to liability claims is no less valid in the present case. Like the Court in *Eastern Connecticut,* however, I am "not persuaded that the insurance requirement represents the least restrictive means of serving that interest." *Id.*

In holding that the state did not make an adequate showing to sustain the insurance requirement in the *Eastern Connecticut,* case, the Court relied on the uncontroverted fact that an "earlier [event sponsored by the same plaintiff] produced no injuries or claims against the state, and indeed that no claims had ever been made resulting from any use of the [public property at issue]". *Id.* 723 F.2d at 1056. The record before me is equally bare of any evidence of past injuries or past claims against the City arising from any special event at the Bandshell. Furthermore, RAR has now established a seven year track record of sponsoring events which, so far as the evidence reveals, did not produce injuries or otherwise threaten the City with liability claims. On this record I cannot find that the City has met its burden of justifying the insurance requirement as narrowly tailored to meet its legitimate interests.

This analysis furnishes an additional basis for holding the insurance requirement invalid on its face. *Collin v. Smith,* 447 F.Supp. 676, 685–86 (N.D.Ill.1978). Alternatively, the requirement is invalid as applied to RAR.

E. *Hours/Dates of use*

The Guidelines set separate time limits for "performing arts events",

---

7. Evidence at trial indicated that insurance underwriters were especially reluctant to issue special event liability policies for Central Park events after a "free" concert held in Central Park by Diana Ross precipitated much publicized vandalism and violence in and near the park.

8. Evidence before the Court at the preliminary stage of this action indicated that when liability insurance was required, the City insisted on a 1 Million/3 Million policy. That means a policy with a limit of $1,000,000 per covered incident, with a $3,000,000 total policy limit. The record contains no information on how much such a policy would cost in today's insurance market, or indeed whether such a policy is even available.

"most" of which "can be permitted" for up to two hours, and for "festivals" and "multiple performance events", which "can be permitted" for up to six hours. The Guidelines do not define the differences between these three types of events, nor was any evidence adduced at trial which explains how, or if, the City categorizes applications by the type of event planned. Every event is allowed two hours pre-show set up, and two hours postshow break down.[9] "Festivals" are permitted only between the hours of 12:00 p.m. and 6:00 p.m. Evening performances are permitted "under certain circumstances" up to 9:30 p.m.

In addition, the Guidelines prohibit the use of amplified sound at Bandshell events before 12:00 p.m., except "in certain cases of children's theater and acoustic music".[10]

 Every limitation on a speaker's ability to reach willing listeners is an impingement on its First Amendment rights. These time provisions constitute a limitation on event sponsors' abilities to reach willing listeners. The burden thus falls on the City to demonstrate that these limitations are narrowly tailored to serve legitimate state interests.

 I find that the City has justified the starting and ending time limitations on amplified sound as narrowly tailored regulations serving the legitimate interest in protecting the rights of other park users and nearby residents to the quiet enjoyment of their respective refuges. Permitting amplified sound at the bandshell from 12:00 p.m. until 9:30 p.m. is, if vulnerable to criticism at all, overly generous to event sponsors.

 I cannot find, on the record before me, that the City has justified any other aspect of this section of the Guidelines. The City has adduced no evidence that just-

ifies the different treatment accorded to the three types of events mentioned in this section of the Guidelines (performing arts, multiple performance, and festival). To the extent that an event sponsor's First Amendment rights are impinged by being categorized as one type of event instead of another, these vague and undefined categorizations are invalid.

Even if the Guidelines contained some comprehensible criteria for distinguishing among these events, they are so shot through with unfettered grants of discretion to City Administrators as to invalidate them, with the sole exceptions of the starting and ending times for amplified sound.

### F. *Attendance*

 The Guideline section on "attendance" operates as a limit on the size of the audience at any event held at the Bandshell. The Guideline provides that "[i]f the sponsor or the Bandshell Program Director anticipates more than 3,000 [spectators] an alternative site must be considered.... the crowd size [at Bandshell events] must be limited to the above figure."

This limitation on the anticipated size of spectator crowds clearly impinges on the First Amendment rights of RAR, since the First Amendment protects the speaker's right to reach willing listeners. *Saia v. New York*, 334 U.S. 558, 561, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574 (1948); *Kovacs v. Cooper, supra.* The City thus bears the burden of proving that the crowd size limitation contained in the Guidelines is narrowly tailored to further a legitimate state purpose.

The City presented evidence clearly establishing that some limitation on the crowd size of Bandshell events is necessary

---

9. The plaintiff does not challenge the limitation on set-up and break down times, although it seemed to be a point of controversy at the preliminary stage of this litigation. Even assuming some First Amendment protection for a speaker's ability to adequately set-up sound amplification and other equipment, I would be unable to find on the present record that two hours was an inadequate amount of time for that purpose. Thus, even if RAR had pressed their challenge to the set-up and break-down limits (and by some of their counsel's questions

at trial I gathered they may have meant to), I would find these limits narrowly tailored regulations serving the City's interest in controlling the volume and timing of vehicular traffic in Central Park.

10. Acoustic music was defined at trial to mean unamplified music. The City offered no explanation why the Guidelines provide a special exception to a regulation concerned with amplified sound.

to further the City's interests in accommodating as many Central Park users as possible. The Bandshell is located in an area of the park which "attracts more visitors than any other", and which is "a major circulation route." At some point, an overflow crowd from a Bandshell event could block the Mall, and thus impede the traffic flow of other park users. Killian, Tr. 549.

The City has failed, however, to establish that the attendance limitation contained in the Guidelines—3,000—is narrowly tailored to meet the legitimate interest in keeping the park accessible to other park users. Indeed, Mr. Killian testified to the contrary. In response to a question from the Court inquiring whether the Guideline section on attendance prohibits a crowd in excess of 3,000 people, Mr. Killian stated:

> "We attempt to do that. However, there have been crowds larger than that size. You know, when you look at the entire concert ground area, you can fit more people...."

Killian, Tr. 551.[11]

Furthermore, we have seen that the same Guidelines provide for a $100 application processing fee where the anticipated attendance at the Bandshell exceeds 4,000.

On this record, I am unable to find that the City has justified the 3,000 spectator limitation on Bandshell events. There is surely some justifiable limitation available to meet the City's legitimate interest in keeping the area beyond the Bandshell clear for pedestrian traffic, but the record before me reveals only that the City has not yet determined what that justifiable limitation is.

### G. Revenue

■ The Guidelines prohibit, in absolute terms, solicitation "for funds and revenue" anywhere within Central Park.[12] This prohibition clearly impinges on the First Amendment rights of RAR. *Schaumburg v. Citizens for Better Energy, supra,* 444 U.S. at 633, 100 S.Ct. at 834 ("Our cases long have protected speech even though it is in the form of ... a solicitation to pay or contribute money", quoting *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686); *ACORN v. City of Frotenac,* 714 F.2d 813, 815 (8th Cir.1983).

The City failed to identify any legitimate interest underlying this prohibition on solicitation. Needless to say, the City has therefore also failed to meet its burden of demonstrating that this ban on solicitations at Bandshell events is a permissible, narrowly tailored regulation.

### H. RAR's Claims for Damages

RAR claims compensatory and punitive damages in respect of the delays and litigation attendant upon the permits ultimately issued for its 1985 and 1986 Bandshell events.

■ Quite apart from liability, no compensable damages were proved. RAR is an unincorporated association of volunteers, two of whom testified at trial. Assuming *arguendo* that the City subjected RAR to obstructionism so exaggerated as to rise to a constitutional level, the consequence was that volunteers had to expend additional time and effort in obtaining the permits which in fact issued. No demonstrated loss results from these assumed circumstances. Victims of constitutional deprivations must prove actual injury and the amount of their damages as in any other civil case, or be content with nominal damages of one dollar. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). RAR's contention that the volunteer's more time-consuming efforts in obtaining the permits reduced the opportunity to publicize the events, thereby dimin-

---

**11.** In the Affidavit of Joseph Killian in opposition to RAR's motion for preliminary injunctive relief, sworn to April 29, 1986 (contained in Joint Trial Exhibit 1), Mr. Killian avers that the San Juan Fiesta event at the Bandshell "draws approximately 40,000 spectators, or twenty times the peak number of 2000 drawn at the RAR concert". Paragraph 30, p. 16. This is the only information I could find in the copious record that would indicate that the Bandshell might be able to accommodate more than 5,000 people.

**12.** The Guideline prohibition on solicitation applies, by its own terms, to all of Central Park even though the Guidelines themselves purport only to regulate use of the Bandshell.

ishing the attendance, is wholly speculative, and not economically quantifiable.

I also conclude that RAR has failed to prove a deprivation of constitutional rights in respect of either the 1985 or 1986 event. At the April 26, 1985 hearing on the preliminary injunction, Robert Russo, an Assistant Parks Commissioner, testified that he had initially disapproved RAR's 1985 application because, over the prior four years, he and his predecessors had found RAR "very difficult to deal with." The problems were related to excessive sound, unruly attendees, the presence of unregistered vehicles, and delay in posting a cleanup bond. Joint Ex. 1 at A160–162. Of course, RAR disputes these allegations; and the court-endorsed stipulation of partial settlement clearing the way for the 1985 event left the disputes unresolved. *Id.* at A121–124. However, to succeed on its claim for damages, compensatory or punitive, RAR was obliged to prove at trial that Russo's articulated reasons were sham, designed to disguise an actual and unconstitutional motivation, such as disapproval of the content of RAR's message. That proof has not been made.

As for the 1986 event, action on RAR's application may have been delayed by the installation of Killian as the Bandshell program director, and his promulgation of the new Guidelines. But there is no evidence that RAR was discriminated against in the processing of 1986 applications. As noted, the main dispute in 1986 was the City-required use of the sound amplification system. While on the record before me at the time I granted RAR a preliminary injunction on that point, I have for the reasons stated *supra* declined to make that injunction permanent. In these circumstances, there is no basis for an award of either compensatory or nominal damages.

RAR also claims punitive damages. A claim against a municipality for punitive damages under section 1983 does not lie. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

When municipal employees are sued in their individual capacities punitive damages are available against them if their conduct demonstrates "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).

In the present case RAR's claim for punitive damages fails for two reasons. First, the amended complaint charges the individual defendants only in their official capacities. A claim against a public servant "in his official capacity" constitutes in law an effort to impose liability on the entity he represents. *Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985). But the City is not liable for punitive damages.

Conceptually, RAR could move to amend its pleadings to conform to proof of "reckless or callous indifference" on the part of one or more individual defendants to its constitutional rights. But the question does not arise in the case at bar, since as previously noted there is no such proof to which the pleadings might conform.

All RAR's claims for damages are accordingly denied.

*Conclusions*

The foregoing constitutes the Court's findings of fact and conclusions of law. Rule 65(a)(2); Rule 52(a), F.R.Civ.P.

To the extent that the parties' proposed findings of fact and conclusions of law are not adopted herein, they are rejected.

An order of permanent injunction and judgment consistent with this Opinion is being entered concurrently.

## ORDER OF PERMANENT INJUNCTION AND JUDGMENT

This case having come on for trial before the Court sitting without a jury; and the Court having entered concurrently herewith its Findings of Fact and Conclusions of Law; it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

1. This Court's Order dated May 1, 1986 is vacated and superseded by this Order.

2. The defendants, their officers, agents, servants, employees, and attorneys,

and all those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby PERMANENTLY ENJOINED from enforcing against plaintiff Rock Against Racism the following provisions of those certain "Use Guidelines for the Naumberg Bandshell in Central Park" promulgated by the City of New York Parks and Recreation Department, under date of March 21, 1986:

(a) The user fee for the Bandshell sound amplification system.

(b) Those provisions of the Guidelines governing hours of use; provided, however, that defendants may enforce those provisions permitting sound amplification only after 12:00 P.M., and requiring events to be finished by 9:30 P.M.

(c) That provision limiting attendance at the Bandshell and its adjacent concert-ground to a maximum of 3,000 people at any event.

(d) That provision calling for the furnishing of insurance.

(e) That provision prohibiting the solicitation for funds and revenue.

3. Except as specifically provided in the foregoing paragraph of this Order, plaintiff's motion for a permanent injunction and complaint for declaratory judgment are denied.

4. Plaintiff's claims for compensatory and punitive damages are denied.

The foregoing constitutes the final Order and Judgment of this Court.