**ROCK AGAINST RACISM,**
Plaintiff–Appellant,

v.

**Benjamin R. WARD, in his official capacity as Police Commissioner for the City of New York; George Scarpelli, in his official capacity as Chief of Operations for Department of Parks; Sheldon Horowitz, in his official capacity as Special Events Director for the Department of Parks; Robert Russo, in his official capacity as Assistant Parks Commissioner for Citywide Services, New York City Department of Parks and Recreation; Joseph Killian, in his official capacity as Program Director for the Mall Bandshell of the Bethesda Terrace area of Central Park in the City of New York, Department of Parks and Recreation; Mayor Edward Koch, in his official capacity as the Mayor of the City of New York; and the City of New York, Defendants–Appellees.**

No. 765, Docket 87–7417.

United States Court of Appeals, Second Circuit.

Submitted Feb. 25, 1988.

Decided June 2, 1988.

James H. Fosbinder, Tucson, Ariz. (Julie Fosbinder, of counsel), for plaintiff-appellant.

Peter L. Zimroth (Corp. Counsel for City of New York, Larry A. Sonnenshein, Julian L. Kalkstein, New York City, of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, PRATT, Circuit Judge, and DORSEY, District Judge.[*]

DORSEY, District Judge.

This appeal presents a question of balancing a first amendment right against a municipality's exercise of its police powers.

*Facts*

The Naumberg Bandshell is an open air public amphitheater on the west side of Central Park in the City of New York. Appellant, Rock Against Racism ("RAR"), is "an unincorporated association which describes itself as 'dedicated to the espousal and promotion of antiracist views.'" *Rock Against Racism v. Ward*, 658 F.Supp. 1346, 1348 (S.D.N.Y.1987). Appellees are the city, its Mayor, police and park officials. All individuals are sued in their official capacities only.

Since 1979, RAR has sponsored, at the bandshell, an annual program of speakers representing groups opposed to racism, interspersed with musical groups. The city requires a permit for such use. In March 1986, after litigation between the city and RAR over the latter's attempts to obtain permits for the bandshell, the city's Department of Parks issued "Use Guidelines" to govern the granting of permits for and the staging of events at the bandshell. Sponsors must comply with the guidelines to obtain permits. Appellant brought suit challenging the guidelines as facially invalid as a prior restraint on activity protected by the first amendment. Judge Haight, after a five-day trial, permanently enjoined enforcement of some of the guidelines, but declined to enjoin the Sound Amplification Guideline ("SAG") at issue in this appeal. *Rock Against Racism*, 658 F.Supp. at 1360–61. The court later amended and clarified the injunction in an unpublished memorandum opinion and order in respects not relevant here. Memorandum Opinion and Order, No. 85 Civ. 3000–CSH (S.D.N.Y. Apr. 30, 1987) ("Memorandum"). Appellant challenges these rulings only to the extent of the court's failure to enjoin enforcement of the SAG.

Under the SAG, *all* sponsors of events at the bandshell must use a sound system and sound engineer supplied by the city, and no other equipment.[1] The city contracts with

---

[*] Honorable Peter C. Dorsey, United States District Judge for the District of Connecticut, sitting by designation.

1. The Use Guidelines provide as follows:
   *SOUND AMPLIFICATION*
   To provide the best sound for all events Department of Parks and Recreation has leased a sound amplification system designed for the specific demands of the Central Park Bandshell. To insure appropriate sound quality balanced with respect for nearby residential neighbors and the mayorally decreed quiet zone of Sheep Meadow, all sponsors may use only the Department of Parks and Recreation sound system. DEPARTMENT OF PARKS AND RECREATION IS TO BE THE SOLE AND ONLY PROVIDER OF SOUND AMPLIFI-

a private firm which supplies a sound system and technician approved by the city for each event. Thus, the volume, the sound "mix," and the overall sound quality are under the physical control of the city-supplied technician who answers to officials of the Department of Parks. During the musical program, this sound engineer presides at a "mixing board" which controls inputs (sound levels, bass, treble, etc.) from each instrument, performer, or microphone. By varying the sound mix, the sound engineer can control what the audience hears over the speaker system, including both the volume and the aesthetic result or sound quality. The district court found that the city's *practice* is to allow the sponsor to designate a representative to direct the city's engineer in controlling the sound mix while the city's park officials direct the engineer's control of the volume.[2]

The net effect of the trial court's orders, as they are challenged in this appeal, is that the SAG was found to be lawful to the extent that it requires use of a city-provided sound system and city-employed technician to operate it subject to the direction of a representative of the musical performers as to the sound mix, but also subject to the city employee's sole determination when the volume level is excessive. RAR's appeal claims that the SAG, as thus enforced, violates its first amendment right of free expression and must be invalidated. Appellees contend that the SAG, as construed by the district court, is a proper exercise of police power.

*Discussion*

There is no dispute but that the bandshell, a place traditionally "used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions," is a public forum. *Hague v. Committee For Industrial Organization*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.); *Wolin v. Port of New York Authority*, 392 F.2d 83, 88 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed. 2d 275 (1968). As such, the city's regulation of the bandshell's use is subject to the first amendment's limitations on government action which infringes upon the freedom of expression. "In such places, the government's ability to permissibly restrict expressive conduct is very limited." *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). This protection extends to the production and transmission of musical performances, as well as speech. *See Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 567 (9th Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985); *Davenport v. City of Alexandria*, 710 F.2d 148, 150 n. 6 (4th Cir.1983) (en banc); *Goldstein v. Town of Nantucket*, 477 F.Supp. 606, 608 (D.Mass.1979); *see also Tele-Communications of Key West, Inc. v. United States*, 757 F.2d 1330, 1337 (D.C.Cir.1985) (packaging and transmitting television programs, even without original production, protected by first amendment).

Under certain circumstances, the city has the right to regulate expressive conduct which has harmful effects on others. *See Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29 (1986) ("a city's 'interest in at-

CATION, INCLUDING THOUGH NOT LIMITED TO AMPLIFIERS, SPEAKERS, MONITORS, MICROPHONES, AND PROCESSORS. Clarity of sound results from a combination of amplification equipment and a sound technician's familiarity and proficiency with that system. Department of Parks and Recreation will employ a professional sound technician [who] will be fully versed in sound bounce patterns, daily air currents, and sound skipping within the Park. The sound technician must also consider the Bandshell's proximity to Sheep Meadow, activities at Bethesda Ter-

race, and the New York City Department of Environmental Protection recommendations. City of New York Parks & Recreation, Use Guidelines for the Naumberg Bandshell in Central Park (March 21, 1986).

2. The SAG itself does not articulate this procedure, but the court's opinion, *Rock Against Racism*, 658 F.Supp. at 1352–53, and its subsequent memorandum opinion and order clarifying the injunction, Memorandum at 2–3, read the procedure into the SAG as a requirement for validity. The finding that the city followed such a practice is not challenged on appeal.

tempting to preserve the quality of urban life is one that must be accorded high respect' ") (citation omitted); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 297, 104 S.Ct. 3065, 3071, 82 L.Ed. 2d 221 (1984) (where parks would be "more exposed to harm without the sleeping prohibition than with it," ban on sleeping in parks is a reasonable regulation). Content neutral time, place and manner regulations are permissible so long as they are narrowly tailored to serve a substantial government interest and do not unreasonably limit alternative avenues of expression. *Community for Creative Non–Violence*, 468 U.S. at 295, 104 S.Ct. at 3070; *see City of Renton*, 475 U.S. at 50, 106 S.Ct. at 930; *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (reasonable time, place and manner restrictions on commercial speech are permissible provided they are content neutral, serve a significant governmental interest, and leave open ample alternative channels). However, the method and extent of such regulation must be reasonable, that is, it must be the least intrusive upon the freedom of expression as is reasonably necessary to achieve a legitimate purpose of the regulation. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); *Legi–Tech Services, Inc. v. Keiper*, 766 F.2d 728, 735 (2d Cir.1985). *See United States v. Albertini*, 472 U.S. 675, 688–89, 105 S.Ct. 2897, 2906–07, 86 L.Ed.2d 536 (1985) ("an incidental burden on speech is not greater than essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation").

Here, the city's express purpose is to prevent the noise generated at the bandshell from intruding offensively upon those who do not choose to attend or hear the musical presentation.[3] Noise levels may be regulated. *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); *Kovacks v. Cooper*, 336 U.S. 77, 87–89, 69 S.Ct. 448, 453–55, 93 L.Ed. 513 (1949); *cf. Reeves v. McConn*, 631 F.2d 377, 386–87 (5th Cir.1980) (holding that city may establish maximum wattage limits for amplified sound, but declaring ordinance unconstitutional where city failed to justify 20–watt limit), *reh'g denied*, 638 F.2d 762 (1981). The city could lawfully accomplish this purpose by establishing and enforcing reasonable limits on the volume, or noise level, emanating from the bandshell. *See, e.g., Jim Crockett Promotion, Inc. v. City of Charlotte*, 706 F.2d 486, 493 (4th Cir.1983) (upholding ordinance limiting decibel levels as measured by standard metering techniques). The city could impose a reasonable limit on the maximum power of the amplification equipment to be used. *See Reeves*, 631 F.2d at 386–87.

Appellant makes no claim that the volume level has been set below that necessary to carry its message. Appellant does assert that the volume limitations allow the city to discriminate against different sponsors by varying the volume permitted. We do not think the regulations are impermissible on their face—they imply that listeners in the bandshell area should be able to hear the performance, but others should not necessarily be obliged to listen to it. If the regulations are being unconstitutionally applied in a discriminatory manner, appellant may bring an appropriate suit. Appellant also claims that the mix of the input from the performers and their several instruments is essential to the artistic presentation and interpretation and that the choice of sound system, its quality, components, and capacity are essential factors in that presentation, as is the technician who operates it. These claims are not controverted in the record. Appellant argues that the

---

**3.** The district court found that the city had a second objective in implementing the SAG: to ensure the quality of sound at bandshell events. *Rock Against Racism*, 658 F.Supp. at 1352. However, the court justified its conclusion that the SAG was valid with reference only to the city's noise control objective. No determination was made of the weight to be given the city's interest in quality control, nor was there a finding that this objective could not be effected by other, less restrictive means.

SAG impinges on its protected interest in controlling the sound mix of its concerts.[4] The city makes no claim that it may regulate the sound mix, but only the volume. The SAG requires use of the city's sound system and technician, who not only controls the volume emitted from the speaker system to limit the measurable noise level beyond a specified distance from the bandshell, but who also controls the sound mix. Thus, the city must demonstrate that its regulation of the volume is reasonably accomplished by the required use of the city's system and the city's operator and that the requirements do not unnecessarily intrude on the right of artistic expression.

The city's argument for requiring the use of its system and technician refers only to the noise level, the need for a quality system, and the need for compatibility and familiarity between the technician and the system provided. However, restriction to use of the city's choice of sound systems is not shown to be necessary to control noise levels. Any system has a volume control. The quality of the system has a limited relation to the regulation of volume.[5] Nor has the technician's operating knowledge been shown to be essential to the regulation of volume. Indeed, another city official monitors the noise level and instructs the technician as necessary to keep the broadcast volume within the permitted level. *Rock Against Racism,* 658 F.Supp. at 1352.

The city's regulation is valid only to the extent necessary to control volume. Without ruling on the constitutionality of any of the following options, we note that volume control can be exercised by a means for determining when the broadcast volume exceeds the appropriate levels. The sponsor's technician at the control board can then be directed to adjust the controls to keep the volume below such levels or perhaps a city technician can be vested with authority over and ability to control only excess volume. It also may be achieved by a volume limiting device in the possession or control of the city employee or by other means. The city has not shown that the use of devices to limit sound output is not technologically feasible. *See Legi–Tech, Inc.,* 766 F.2d at 736 (remanding for inquiry into feasible alternatives). Such would be well within the city's right and would not violate the performers' first amendment rights by intruding on their choice of sound systems and their decisions on sound mix. It would not involve the city, as does the SAG, in the choice or supply of sound systems nor the operating technician. The city rejected the alternatives of negotiating a decibel level for each event, with the sponsor, or allowing sponsors to use their own sound systems operated by the city's technician.

While the city may properly regulate the broadcast volume, it has not shown, nor has a record been established from which it could be found, that the requirement of the use of the city's sound system and technician was the least intrusive means of regulating the volume. The sound system and its operation are not questioned as an element of the artistic performance and thus are protected as a means of artistic expression. The city has not shown a justification for intrusion upon that right of expression, nor has the city shown that such intrusion is reasonably necessary to control the volume.

The city demonstrated, and the trial court found, that performing groups have

---

4. The district court considered RAR's first amendment interest in using its own sound system and engineer to be attenuated or nonexistent. *Rock Against Racism,* 658 F.Supp. at 1353. However, RAR and other sponsors clearly have a protected interest in directly controlling the sound mix and the choice of the system as an essential element of the artistic presentation. *See Cinevision Corp. v. City of Burbank,* 745 F.2d 560 at 568–69 (9th Cir.1984) (discussing role of concert promoters as protected by first amendment).

5. While the court below found that the city has a legitimate interest in sound quality, it did not address this interest as a justification for the SAG requirement that *only* the city's system and technician be used. Because, on this record, the city's interest in sound quality has not been shown to justify the SAG requirements, we need not consider RAR's argument that a government desire to maintain the *quality* of expression can never be a "legitimate interest" which may justify restrictions on the *manner* of the expression.

not in the past proven cooperative in adhering to prescribed sound levels. There is nothing in the record to suggest that the city cannot devise methods to control the volume, even in the face of noncooperation, without requiring the use of a designated sound system operated by the city's technician.[6] In the highly subjective realm of music, legitimate regulation of noise levels does not justify standardization. The required use of the city's system and technician forces each performer and sponsor to filter its sound quality, tone, mix, and other aesthetic factors through the city's technician and sound system. On the present record, such requirements are not necessary to control volume and are not otherwise shown to meet the standard of the least intrusive restriction on first amendment rights. Therefore, to the extent the SAG requires the use of only the city-provided sound system operated by the city's designated technician, it is an unnecessary intrusion on, and a violation of, the first amendment right of the performers.

Accordingly, to the extent the trial court's judgment sustained the right of the city to limit volume of performances broadcast from the bandshell to a level otherwise specified as reasonable, it is affirmed. To the extent it upheld the SAG requirement of the use of a sound system furnished by the city and operated by a technician designated by the city, it is reversed. The judgment of the trial court is affirmed in part and reversed in part and is remanded for the purpose of entering a modified order consistent with this opinion.

6. As a last resort if such methods fail, the plug can be pulled on the sound to enforce the volume limit. While this would terminate the particular non-complying sponsor's concert, it is a reasonable alternative to restriction on the expressive rights of sponsors who routinely comply with reasonable volume limits.